Jordan Brewer
#18558-081
FCI Englewood
9595 W. Quincy Ave.
Littleton, CO 80123

Plaintiff, pro se

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

JUN 2 2 2015

D. MARK JONES, CLERK
BY_____
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH — NORTHERN DIVISION

| | |
|---|---|
| JORDAN ALAN NEVES BREWER, | Case No. 1:15-cv-00040 TC |
| Plaintiff, | Hon. Judge Tina Cambell |
| v. | Civil Action |
| TERRY THOMPSON, KEVIN BURTON, JOSEPH PORTER, KERI SEKULICH, JEREMY MILLER, JORDAN BONYAI, PAT COLLINGSWORTH, JOHN WOOD, RICHARD RUSSEL, TODD RICHARDSON, [First Name Unknown] Jensen, [First Name Unknown] Manfull, SHEILA PERRY, et al., | TRIAL BY JURY DEMANDED |
| Defendants. | |

SECOND AMENDED COMPLAINT

COMES NOW, Jordan A. Brewer, Plaintiff, pro se, who presents the
following civil rights and RICO complaint and claim for declaratory relief and
for damages, states:

I. INTRODUCTION

1.     This action places before the Court a lawsuit involving the
administrations of the Davis County Sheriff's Office (hereinafter, "DCSO") and
the Weber County Sheriff's Office (hereinafter, "WCSO").

2.     This complaint alleges that multiple violations of Plaintiff Jordan Alan Neves Brewer's First and Fourteenth Amendment rights were violated and that he was also victim to a violation of 18 U.S.C. § 1962 while he was held at the Davis County Correctional Facility (hereinafter, "DCCF") and the Weber County Correctional Facility (hereinafter, "WCCF") as a federal pretrial detainee held in the care and custody of the United States Marshal's Service (hereinafter, "USMS") by the defendants.

## II. PARTIES

### Plaintiff:

3.     JORDAN ALAN NEVES BREWER (hereinafter, "Plaintiff Brewer" or "the plaintiff") was at all times relevant to this complaint a federal pretrial detainee held in the care and custody of the USMS at the DCCF and the WCCF.

### Defendants:

4.     TERRY THOMPSON (hereinafter, "Defendant Thompson"), at all times relevant to this action, was/is the Sheriff of Weber County and was charged with the custody and care of the plaintiff while he was held at the WCCF as a federal pretrial detainee. Defendant Thompson was the WCSO's highest authority, responsible for: the employment, appointment, and oversight of the WCSO; the oversight of facility operations generally; the creation, promulgation, and enforcement of the official policies and customs of the WCSO; and was the final appellate authority over all inmate grievances and concerns. Defendant Thompson acted under the color of state law at all times relevant to this complaint. He is hereby sued in his individual and official capacities for those acts and omissions described fully below.

5.     KEVIN BURTON (hereinafter, "Defendant Burton"), at all times

relevant to this action, was/is the Chief Deputy in the WCSO and the Jail Commander at the WCCF, and was charged with the care and custody of the plaintiff while he was held at the WCCF as a federal pretrial detainee. Defendant Burton was responsible for: the oversight of the WCCF's day-to-day operations; the oversight of staff assigned to work at the WCCF; the promulgation and enforcement of WCSO policies and customs of the WCSO; the preparation of responses to inmate grievances and concerns for Defendant Thompson to sign; and the writing of responses to letters addressed to Defendant Thompson by inmates held at the WCCF. Defendant Burton acted under the color of state law at all times relevant to this complaint. He is hereby sued in his individual and official capacities for those acts and omissions described fully below.

6.     JOSEPH PORTER (hereinafter, "Defendant Porter"), at all times relevant to this action, was/is a Sergeant in the WCSO, assigned to work at the WCCF, and charged with the care and custody of the plaintiff while he was held at the WCCF as a federal pretrial detainee. Defendant Porter was responsible for heading the Disciplinary Department and the Inmate Services Department at the WCCF, operation of the mailroom, inmate legal activities, and the responses to inmate formal grievances. Defendant Porter acted under the color of state law at all times relevant to this complaint. He is hereby sued in his individual and official capacities for those acts and omissions described fully below.

7.     KERI SEKULICH (hereinafter, "Defendant Sekulich"), at all times relevant to this action, was/is a Lieutenant in the WCSO, assigned to work at the WCCF, and was charged with the care and custody of the plaintiff while he was held at the WCCF as a federal pretrial detainee. Defendant Sekulich was responsible for answering inmate informal grievances and for assisting Defendant Porter and other staff in the Inmate Services Department and in the mailroom. Defendant Sekulich acted under the color of state law at all times relevant to this complaint. She is hereby sued in her individual and official

3

capacities for those acts and omissions described fully below.

8.    JEREMY MILLER (hereinafter, "Defendant Miller"), at all times relevant to this action, was/is a Lieutenant in the WCSO, assigned to work at the WCCF, and was charged with the care and custody of the plaintiff while he was held at the WCCF as a federal pretrial detainee. Defendant Miller acted under the color of state law at all times relevant to this complaint. He is hereby sued in his individual and official capacities for those acts and omissions described fully below.

9.    JORDAN BONYAI (hereinafter, "Defendant Bonyai"), at all times relevant to this action, was/is a Deputy in the WCSO, assigned to work at the WCCF, and was charged with the care and custody of the plaintiff while he was held at the WCCF as a federal pretrial detainee. Defendant Bonyai acted under the color of statte law at all times relevant to this complaint. He is hereby sued in his individual and official capacities for those acts and omissions described fully below.

10.    PAT COLLINGSWORTH (herein after, "Defendant Collingsworth"), at all times relevant to this action, was/is a Mail Clerk in the WCSO, and was assigned to work at the WCCF. Defendant Collingsworth acted under the color of state law at all times relevant to this complaint. She is hereby sued in her individual and official capacities for those acts and omissions described fully below.

11.    JOHN WOOD (hereinafter, "Defendant Wood"), at all times relevant to this action, was/is a Contract Physician and Medical Director in the DCSO and WCSO, and assigned to work at the DCCF and WCCF where he provided medical care to inmates. Defendant Wood acted under the color of state law at all times relevant to this complaint. He is hereby sued in his individual and official capacities for those acts and omissions described fully below.

12.    RICHARD RUSSEL (hereinafter, "Defendant Russel"), at all times

4

relevant to this action, was/is a Contract Physician's Assistant, who worked under the direction of Defendant Wood, in the WCSO, and was assigned to work at the WCCF where he provided medical care to inmates. Defendant Russel acted under the color of state law at all times relevant to this complaint. He is hereby sued in his individual and official capacities for those acts and omissions described fully below.

13.  TODD RICHARDSON (hereinafter, "Defendant Richardson"), at all times relevant to this action, was/is the Sheriff of Davis County and was over charged with the care and custody of the plaintiff while he was held at the DCCF as a federal pretrial detainee. Defendant Richardson is the DCSO's highest authority, responsible for: the employment, appointment, and oversight of the DCSO; the oversight of facility operations generally; and the creation, promulgation, and enforcement of the official policies and customs of the DCSO. Defendant Richardson acted under the color of state law at all times relevant to this complaint. He is hereby sued in his individual and official capacities for those acts and omissions described fully below.

14.  [First Name Unknown] JENSEN (hereinafter, "Defendant Jensen"), at all times relevant to this action, was/is a Lieutenant in the DCSO and the Jail Commander of the DCCF, and was charged with the care and custody of the plaintiff while he was held at the DCCF as a federal pretrial detainee. Defendant Jensen was responsible for the day-to-day operations of the DCCF and for the enforcement and promulgation of the official policies and customs of the DCSO. Defendant Jensen acted under the color of state law at all times relevant to this complaint. He is hereby sued in his individual and official capacities for those acts and omissions described fully below.

15.  [First Name Unknown] MANFULL (hereinafter, "Defendant Manfull"), at all times relevant to this action, was/is a Deputy in the DCSO, assigned to work at the DCCF, and charged with the care and custody of the

plaintiff while he was held at the DCCF as a federal pretrial detainee. Defendant Manfull was responsible for heading the Programs Department and overseeing inmate legal activities at the DCCF. Defendant Manfull acted under the color of state law at all times relevant to this complaint. He is hereby sued in his individual and official capacities for those acts and omissions described fully below.

16.     SHEILA PERRY (hereinafter, "Defendant Perry"), at all times relevant to this action, was/is a Contract Social Worker in the DCSO and WCSO, and assigned to work at the DCCF and WCCF. Defendant Perry acted under the color of state law at all times relevant to this complaint. She is hereby sued in her individual and official capacities for those acts and omissions described fully below.

17.     To the best of the plaintiff's knowledge and belief, Defendants Thompson, Burton, Porter, Sekulich, Miller, Bonyai, Collingsworth, Wood, Russel, and Perry can all be served at the WCSO at 721 West 12th Street, Ogden, Utah 84404.

18.     To the best of the plaintiff's knowledge and belief, Defendants Richardson, Jensen, Manfull, Wood, and Perry can all be served at the DCSO at 800 West State Street, Farmington, Utah 84025.

## III. JURISDICTION AND VENUE

19.     Jurisdiction is asserted pursuant to the United States Constitution, 42 U.S.C. § 1983, and 18 U.S.C. § 1965, to redress the deprivation of those rights secured by the United States Constitution deprived by persons acting under the color of state law and for violations of 18 U.S.C. §§ 1962 and 1964(c). The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

20. The United States District Court for the District of Utah is the proper venue for trial pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this action occurred in Davis County and Weber County, which are both located in the Northern Division of this District Court.

## IV. PREVIOUS LAWSUITS

21. The plaintiff has filed one previous lawsuit in federal court in regards to the conditions of his confinement. The suit, Brewer v. Wood, et al., No. 1:12-cv-123-TS (N.D.Utah 2012), was for the deprivation of Fourteenth Amendment rights in regards to provide adequate medical care and for the denial of access to the courts. After Plaintiff Brewer was subjected to a series of retaliatory transfers and being denied adequate assistance in filing meaningful documents with the courts, the plaintiff filed for a voluntary dismissal of the action pursuant to Fed.R.Civ.P. 41(a) and was granted dismissal without prejudice shortly after the defendants filed a motion for dismissal for failure to state a claim. The plaintiff now refiles these allegations herein.

22. The plaintiff has filed no other suits in federal court and the issues presented herein are not in controversy in any other pending litigation.

23. No strikes have been issued against the plaintiff pursuant to 28 U.S.C. § 1915(g).

## V. STATEMENT OF FACTS

### Count One

24. Count One alleges the denial of adequate medical and mental

7

health care while Plaintiff Brewer was held at the DCCF and WCCF under the medical guidance of Defendant Wood and his agents.

25.     On or about November 25, 2008, Plaintiff Brewer was diagnosed with dysthymia and major depressive disorder by his primary family care physician, Dr. John Friden (hereinafter, "Dr. Friden"), at the Intermountain Health Care (hereinafter, "IHC") South Ogden Clinic, whom the plaintiff had seen off and on for the duration of his life. To treat the symptoms of the dysthymia and major depressive disorder, Dr. Friden prescribed a daily dose of Bupropion XL, a generic formula of Wellbutrin XL, a psychotropic medication commonly used to treat depression.

26.     On or about July 12, 2010, Dr. Friden further diagnosed the plaintiff with anxiety disorder with a secondary symptom of insomnia. He discontinued the Bupropion XL and started Plaintiff Brewer on Lexapro and Trazodone.

27.     On or about September 10, 2010, Dr. Friden discontinued the Trazodone treatment due to complaints made by the plaintiff that it left him feeling groggy the following morning after taking the medication. Dr. Friden prescribed Zolpidem as an alternative treatment.

28.     On or about January 7, 2011, Dr. Friden discontinued the Zolpidem treatment after Plaintiff Brewer reported having hallucinations while taking the medication. Dr. Friden restarted the plaintiff on Trazodone again.

29.     At some point between January 2011 and October 2011, Dr. Friden restarted Plaintiff Brewer on Bupropion XL to be taken in the morning and moved the Lexapro to the evenings to be taken with the Trazodone. This change occurred during a casual encounter while the plaintiff was at the IHC South Ogden Clinic where his mother, Nala Brewer, is also employed as an x-ray technician.

30.     On or about October 13, 2011, Plaintiff Brewer was arrested

by the Federal Bureau of Investigation (hereinafter, "FBI") and booked into the DCCF as a federal arrestee. On or about October 14, 2011, Plaintiff Brewer was taken from the DCCF by the arresting FBI Special Agent, Jeff Ross, and trans transferred into the custody of the USMS and then returned to the DCCF as a federal pretrial detainee.

31.    When the plaintiff was booked into the DCCF on or about October 13, 2011, he was taken to the Medical Department and was interviewed by Nurse Gabrielle Edwards (hereinafter, "Nurse Edwards"). The plaintiff explained to Nurse Edwards that he had been diagnosed Dr. Friden at the IHC South Ogden Clinic with dysthymia, major depressive disorder, anxiety disorder, and insomnia. The plaintiff stated that he was currently taking Bupropion XL, Lexapro, and Melatonin to treat the symptoms of his mental health disorders. The plaintiff explained that he was substituting the Trazodone for Melatonin because of the cost of the medication. Melatonin is an over-the-counter (hereinafter, "OTC") supplement used as a simple sleep aid. Nurse Edwards told the plaintiff that Defendant Richardson had implemented a policy and/or custom at the DCCF where Davis County would only provide certain, inexpensive medications to inmates held at the DCCF and all other medications would have to be provided to the plaintiff by his friends and family. Otherwise, Plaintiff Brewer would have to discontinue the treatment.

32.    The plaintiff contacted his parents, Robert and Nala Brewer, and informed them of the DCSO's policy and/or custom in regards to his medications and that he needed his parents to fill his prescriptions and bring them to the DCCF. The plaintiff's parents live in Ogden, in Weber County, approximately 30 miles from Farmington in Davis County. However, despite the distance and considerable inconvenience and cost, the plaintiff's parents agreed to fill his medications and drive to Farmington to deliver them to the DCCF for Plaintiff Brewer's use. However, when the plaintiff's parents brought

the medications to the DCCF, DCSO officials accepted the Bupropion XL and the Lexapro, but refused to accept the Melatonin, stating that Defendant Richardson had implemented a policy or custom that prohibited OTC medications brought to the DCCF intended for inmates. As a result, Plaintiff Brewer started suffering from the symptoms of his diagnosed insomnia.

33.     Within a few days, the plaintiff began receiving the Bupropion XL and Lexapro at Med-Pass (the DCSO medical staff would bring a cart into each of the housing units twice a day to give inmates their medications, this practice was referred to as "Med-Pass"). However, contrary to how Dr. Friden had directed the plaintiff to take the medications, the Bupropion XL and the Lexapro were given to Brewer in the morning. When the plaintiff objected, he was threatened with disciplinary action if he did not take both medications in the morning.

34.     The plaintiff's parents returned with a filled prescription for Trazodone and attempted to provide it to the DCSO officials, but were turned away because Trazodone was not on the list of approved medications at the DCCF. This list was created by Defendants Wood and Richardson.

35.     The plaintiff's parents contacted Dr. Friden's office and explained that both the Melatonin and the Trazodone were being denied to the plaintiff. Dr. Friden then prescribed Rozerem, a prescription strength sleep aid. The plaintiff's parents filled the prescription for Rozerem and brought the medication to the DCCF, but DCSO official refused to accept the medication because Defendants Richardson and Wood had set up a policy or custom that denied any type of medication that was intended for the use as a sleep aid or which had a potential side-effect of drowsiness.

36.     When the plaintiff's parents informed Dr. Friden's office about the policy or custom denying sleep aids and medications that had symptoms of drowsiness, Dr. Friden's office faxed a physician's order to the DCCF addressed

to Officer Joe O'Callaghan on or about October 16, 2011. The order stated that Brewer needed to be started Lexapro, Bupropion XL, and Rozerem.

37.    The plaintiff started to suffer from panic attacks soon after being booked into the DCCF, but at the time this was mistaken for being over-medicated due to the taking of the Bupropion XL and Lexapro at the same time each morning instead of separately morning and night. As such, when Dr. Friden learned of the new symptoms, he faxed an order to the DCCF asking officials to discontinue the Bupropion XL. This order was faxed on or about November 2, 2011. A physician's assistant, Bruce M. Burnham, reviewed the order and approved the discontinuance of the Bupropion XL.

38.    On or about November 11, 2011, Brewer asked to speak with the on-staff physician concerning his untreated symptoms of insomnia secondary to his anxiety disorder. Instead, the plaintiff was seen by Defendant Perry. The plaintiff explained to Defendant Perry of his parents' attempts to bring his prescribed medications to the DCCF to treat his anxiety disorder and the secondary symptom of insomnia, but were being turned away. Defendant Perry noted that Plaintiff Brewer complained of not being able to get to sleep each night for more than four hours at a time and of having symptoms of shaky hands and shortness of breath. Defendant Perry noted that Plaintiff Brewer was on medication in the past for anxiety and was requesting treatment for his symptom of insomnia. Defendant Perry stated to the plaintiff, and made reference to the statement in her notes, that he would not receive treatment at the DCCF for his anxiety disorder or his symptoms of insomnia. Plaintiff Brewer stated that he wished to discuss that with the treating physician at the DCCF, but was never seen.

39.    When it became clear that Plaintiff Brewer was in fact having panic attacks and not simply suffering from symptoms of being overly-medicated, Dr. Friden faxed in an order on or about January 12, 2012 directing

11

that the plaintiff was to be restarted on Bupropion XL in the morning (at a reduced dosage of 150 mg down from 300 mg) and to move the dose of Lexapro from mornings to evenings. In the fax, Dr. Friden warned that missing the proper doses "can have adverse consequences" and asked officials to "[p]lease assist Mr. Brewer in receiving every dose."

40.   On or about January 17, 2012, Defendant Wood reviewed the fax from Dr. Friden's office, but refused to honor it. He made an arbitrary decision to ignore the direction, noting that Plaintiff Brewer had been taking Bupropion XL at the DCCF from on or about October 13, 2011 through November 3, 2011, and that the plaintiff's parents had been providing the medication for the County. It should be noted that Defendant Wood had never seen Plaintiff Brewer as a patient or otherwise and had conducted no assessments or tests needed to make an informed decision based on medical scientific fact before coming to a conclusion as to the care that Plaintiff Brewer may need.

41.   On or about January 23, 2012, the plaintiff submitted a medical request slip, and was charged $1.00 for doing so, requesting to be restarted on Bupropion XL, noting that his parents had refilled the prescription and had brought it to the DCCF, and that Dr. Friden had faxed a notice directing officials to restart Plaintiff Brewer on the medication. The response, by an unknown official, stated that Defendant Wood had not approved Wellbutrin for use at the DCCF, that the Bupropion XL had been returned to the plaintiff's property locker, and that the plaintiff could continue to receive Lexapro for as long as the plaintiff's family was willing to provide it for the County; but stating, "You will not get Wellbutrin here." (emphasis in original).

42.   Despite this, officials at the DCSO continued to tell the plaintiff's family that Bupropion XL was on the "approved list" of medications, but that the DCSO had hired a new physician, Defendant Wood, and that he was not approving the medication at the DCCF.

43.     On or about February 1, 2012, the plaintiff's mother called the DCCF and noted that Brewer had been taking Bupropion XL and did not want it stopped. The plaintiff's mother had stated that she had had Dr. Friden's office fax in the request on or about January 17, 2012 requesting that Plaintiff Brewer be restarted on the Bupropion XL treatment. Defendant Wood noted that he had reviewed this and that he had Plaintiff Brewer's Bupropion XL sent to his property locker instead of being given to the plaintiff at Med-Pass.

44.     Since the Lexapro, alone, was failing to adequately treat Plaintiff Brewer's symptoms of his dysthymia, major depressive disorder, and anxiety disorder, Plaintiff Brewer submitted a medical request slip, and was charged $1.00, requesting to be seen by the staff physician. Plaintiff Brewer was seen on or about February 21, 2012 by Defendant Wood, and charged $10.00 for the privilege despite the plaintiff being a federal pretrial detainee and entitled to a $2.00 fee per medical issue. This was the first time the plaintiff had been seen by Defendant Wood. At the time that Plaintiff Brewer was called into the examination room, Defendant Wood was talking to a nurse and was in the process of iterating his biased opinions of inmates in general, stating that <u>all</u> inmates were drug addicts and that every one of them only wanted to get free drugs from <u>his</u> medical department so they could get high while they were in jail. When Defendant Wood addressed Plaintiff Brewer and inquired as to why the plaintiff was there, the plaintiff stated that he was suffering from bouts of severe depression and wanted to be started on his Bupropion XL, as Dr. Friden directed in his fax. Defendant Wood then addressed the nurse and called Plaintiff Brewer a "Wellbutrin-junkie." When the plaintiff inquired of Defendant Wood what a Wellbutrin-junkie was, Defendant Wood accused Plaintiff Brewer of not needing Bupropion XL but only wanted it so he could crush it and snort it so the plaintiff could get high. Plaintiff Brewer denied the accusation, noting that he had never been accused of abusing drugs

in his entire and had never received a disciplinary action while at the DCCF for anything regarding his medications, even while he was taking the Bupropion XL in October 2011. Defendant Wood scoffed and replied that Plaintiff Brewer simply hadn't been caught yet. Instead of allowing the plaintiff to receive Bupropion XL, Defendant Wood ordered that Plaintiff Brewer's dosage of Lexapro be changed from 10 mg to 20 mg, so long as his family continued to supply it for the County. It should be noted that the manufacturer of Lexapro has published that they had found no measurable difference in results between the 10 mg dosages and 20 mg dosages of Lexaprop when they conducted their drug trials. This was also done without Defendant Wood conducting any mental health assessments or other tests. Plaintiff Brewer found no benefit from the increased dosage. Plaintiff Brewer requested that Defendant Wood obtain a copy of the plaintiff's medical records from IHC or call Dr. Friden's office to get the plaintiff's medical history. Defendant Wood refused, stating, "That's not my job." Plaintiff Brewer inquired if there was any other medication similar to Bupropion XL that would be available to him at the DCCF. Defendant Wood said no and then stated, "If you don't like it, don't come to jail." Plaintiff Brewer inquired about obtaining treatment for his anxiety disorder and his secondary insomnia. Defendant Wood stated that those disorders weren't treated at the DCCF since being in jail was normally a high stress environment. When the plaintiff inquired as to why Defendant Wood was denying him treatment, Defendant Wood replied, "The medication costs too much and everyone would be in here for it."

45.    In or about March 2012, the plaintiff started to suffer from considerable and chronic pain in his thoracic spine, specifically the area between his shoulder-blades. However, due to Plaintiff Brewer's obvserved bias from Defendant Wood, he chose not to report the issue to medical staff in order to save money and because he believed that Defendant Wood would not provide any treatment for it. The plaintiff started to self-medicate with Tylenol 400mg

that was available to the plaintiff for free during Med-Pass. This treatment
failed to even take the edge off of Plaintiff Brewer's pain. When several other
inmates came to the plaintiff after observing the plaintiff in pain for several
days, Plaintiff Brewer reported the issue to medical staff after these inmates
stated to the plaintiff that if he did not report the issue to medical staff,
then they would report the issue to medical staff due to the obvious pain that
the plaintiff was in. These inmates were Jonathan Kirby Bay and William
Pumphrey. Plaintiff Brewer reported the issue on the inmate medical slip, and
was charged $1.00.

46.    Plaintiff Brewer was seen by Defendant Wood on or about March
28, 2012 for the plaintiff's complaints of back pain. The plaintiff was charged
$10.00 to be seen. Defendant Wood noted that the plaintiff complained of upper-
back pain and of a tingly sensation in his arms and a loss of feeling in his
fingers. The issue was worse in the left arm than the right. Plaintiff Brewer
reported that he had not been in a fight or other altercation. Defendant Wood
noted that it appeared that the plaintiff was having some strain in his
cervical spine, but could not identify the focal point. Defendant Wood ordered
that Plaintiff Brewer be given Naprosyn, a generic, OTC non-steroidal anti-
inflammatory drug (hereinafter, "NSAID") with a similar dosage and effect of
the Tylenol that the plaintiff was already receiving for free during Med-Pass,
effectively denying any further treatment. Plaintiff Brewer inquired of
Defendant Wood what Naprosyn was and Defendant Wood replied that it was just
"glorified Tylenol." Plaintiff Brewer requested that tests be conducted to
determine the nature and cause of his injury. Defendant Wood refused. Plaintiff
Brewer requested that if Defendant Wood wasn't willing to treat him, then the
plaintiff should be taken to the hospital where he could obtain his own medical
care since the plaintiff had his own medical insurance. Defendant Wood refused,
stating, "Quit your whining, you aren't convincing anyone that you're hurt."

47.     When the Naprosyn was as ineffective as the Tylenol had been at remedying Plaintiff Brewer's chronic pain, the plaintiff contacted his parents and asked them to get in contact with his lawyers and petition the courts for a medical furlough so he could be temporarily released from his pretrial detention so he could go to the hospital. The plaintiff's mother called Camielle Neider (hereinafter, "Ms. Neider"), one of the plaintiff's attorneys, and explained the issue to her. Ms. Neider contacted the court and learned that the judge would only consider granting a medical furlough if the jail doctor submitted a recommendation.

48.     Still complaining of his chronic back pain, Plaintiff Brewer submitted another inmate medical slip, and was charged $1.00, on or about April 12, 2012, asking for a follow-up with the physician.

49.     Plaintiff Brewer was seen by Defendant Wood on or about April 16, 2012, and was charged $10.00 for the visit. Plaintiff Brewer explained that his attorney had said that if the jail doctor would recommend a medical furlough that the could would grant one. Defendant Wood stated that the plaintiff would not be getting a medical furlough. Plaintiff Brewer asked for a more effective pain management treatment, but Defendant Wood refused. Due to the plaintiff's familiarity with Ibuprofen as his normal go-to medication for pain prior to his pretrial detention, Plaintiff Brewer requested to be switched to Ibuprofen. Ibuprofen is an OTC NSAID. Defendant Wood reluctantly agreed. Plaintiff Brewer asked for x-rays to be taken and, at first, Defendant Wood refused, but changed his mind after the plaintiff persisted in stating that he had a right to receive treatment.

50.     Plaintiff Brewer received x-rays from a contract x-ray technician on or about April 16, 2012. The x-rays were taken of Plaintiff Brewer's cervical spine.

51.     Defendant Wood reviewed the x-rays on or about April 19, 2012

and concluded that the x-rays were normal except for a minimal reverse lordosis (an abnormal curvature of the spine comparable to scoliosis). However, Defendant Wood ruled that this was due to a muscle spasm and was related to the complaint of pain in the plaintiff's thoracic spine. No further tests or follow-ups were ordered.

52.    On or about April 25, 2012, Plaintiff Brewer submitted an inmate medical slip, and was charged $1.00, asking about the results of his x-rays. The response, from an unknown official, stated, "No F/U [sic] requested by Dr [sic] and your x-ray were [sic] normal." The plaintiff understood that "F/U" was to mean "follow-up" and "Dr" was to mean "doctor."

53.    The plaintiff submitted another inmate medical slip, and was charged $1.00, stating that he was still experiencing chronic, upper-back pain, that he wanted to know what to do about it, and asked to be able to set up an inmate transport to see his chiropractor, a cost of $80.00, according to the price listed on the inmate medical slip.

54.    Plaintiff Brewer was seen by Defendant Wood on or about May 1, 2012, and was charged $10.00 for the visit. The plaintiff suggested being allowed a transport to be seen by an outside physician or by his chiropractor, but Defendant Wood responded, "You will not be getting one of those." Instead, Defendant Wood ordered more x-rays.

55.    On or about May 2, 2012, Plaintiff Brewer had x-rays taken of his thoracic spine. No injuries were seen off of the x-ray.

56.    On or about May 9, 2012, Plaintiff Brewer submitted an inmate medical slip, and was charged $1.00, asking about the results of his x-rays and about receiving his Bupropion XL and Rozerem. The response stated a denial of the the medication and also that the x-rays were normal.

57.    On or about May 11, 2012, Plaintiff Brewer submitted an inmate medical slip, and was charged $1.00, asking to have a medical transport set up

for the plaintiff to be taken to an outside physician for treatment. The
response stated that
response, by an unknown official, stated that the plaintiff needed Defendant
Wood's recommendation to receive a second opinion in relation to Defendant
Wood's medical conclusions.

58.    On or about May 22, 2012, Plaintiff Brewer submitted an inmate
medical slip, and was charged $1.00, asking for a magnetic reasoning imaging
(hereinafter, "MRI") test or a CAT scan to be conducted in regards to his
chronic back pain.

59.    On or about May 28, 2012, Plaintiff Brewer was seen by
Defendant Wood, and charged $10.00 for the visit. Plaintiff Brewer requested
an MRI or a CAT scan. Defendant Wood stated that he didn't think that the
plaintiff need and MRI and then asked how long the plaintiff was going to be at
the DCCF. Plaintiff Brewer stated that he did not know how long he was going to
be at the DCCF as he was a federal pretrial detainee still fighting his case.
Defendant Wood then stated, "Well, I don't think you need an MRI right now, but
I recommend that you get one as soon as you leave the jail." Plaintiff Brewer
asked Defendant Wood if he was willfully denying him medical care. Defendant
Wood replied, "If you're unhappy with your level of care here, then plead
guilty to your charges so you can go to prison where they will treat your
conditions." Plaintiff Brewer asked how to file a grievance on Defendant Wood.
Defendant Wood replied, "Good luck." Plaintiff Brewer also addressed his mental
health needs and his desire to be started on the Bupropion XL and Rozerem.
Defendant Wood refused and discontinued Plaintiff Brewer's Lexipro and started
him on Prozac. Defendant also increased the dosage of the plaintiff's NSAIDs.

60.    Plaintiff Brewer wrote a letter to Defendant Richardson
complaining of the the conduct of Defendant Wood in or about the month of May
2012. However, Defendant Richardson never attempted to intervene nor did he
respond to Plaintiff Brewer's letter.

61.     Plaintiff Brewer submitted a grievance concerning the conduct of Defendant Wood, and was charged $1.00, but it was never responded to.

62.     On or about June 2, 2012, Plaintiff Brewer filed suit in the United States District Court for the District of Utah against officials of the DCSO claiming the denial of access to the courts, as described fully below, and for the failure to provide adequate medical care.

63.     On or about June 14, 2012, Plaintiff Brewer again tried to file a grievance on Defendant Wood, and was charged $1.00. However, Plaintiff Brewer was instead scheduled to be seen by Defendant Wood and charged $10.00 for the visit. Defendant Wood switched Plaintiff Brewer's NSAID from Ibuprofen back to Naprosyn. Defendant Wood continued to refuse to treat the plaintiff's anxiety disorder and secondary insomnia, and continued to refuse to provide adequate medical and mental health treatments for the plaintiff's chronic back pain, major depressive disorder, and dysthymia. Defendant Wood ignored the plaintiff's complaints that the NSAID treatment was failing to even take the edge off of the pain on his bad days and left him with a dull burning sensation on his good days.

64.     On or about August 6, 2012, Plaintiff Brewer was seen by Defendant Wood, and was charged $10.00 for the visit. Plaintiff Brewer complained that the Prozac was not sufficiently treating his depression, panic attacks, lethargy, and feelings of dread. Defendant Wood again asked Plaintiff Brewer how long he was going to be at the DCCF. Plaintiff Brewer stated that he didn't know as he was still fighting his federal criminal case. Plaintiff requested treatment for his diagnosed mental health disorders that would effectively remedy his symptoms. Plaintiff further noted that his symptoms of panic attacks and insomnia were still not being treated. Defendant Wood discontinued the plaintiff's Prozac and started him on Celexa.

65.     On or about August 7, 2012, the plaintiff was seen by

Defendant Perry. Plaintiff Brewer complained that he was still having panic attacks, feelings of dread and depression, and was emotionally drained. Plaintiff Brewer also noted that he was beginning to suffer from chest pressure that would sometimes last only a few minutes and other times would last for hours. Defendant Perry's response that the plaintiff should "just take ten breaths." That was the only assistance Defendant Perry would provide.

66.    On or about September 13, 2012, Plaintiff Brewer was subjected to a retaliatory transfer from the DCCF to the WCCF for his filing suit against DCSO officials. During the booking process, Plaintiff Brewer told the booking officer, an unknown female deputy, that the plaintiff had an open, pending civil action against Defendant Wood and that it was a conflict of interest for Plaintiff Brewer to be subjected to Defendant Wood's medical care. The officer asked the plaintiff to sign a form that stated that Defendants Wood and Russel could practice medicine on the plaintiff. The plaintiff objected, but signed the form after the officer stated that no emergency medical care could be performed on the plaintiff if he did not sign the form and that she would make a special note in the plaintiff's records that he was not to be seen by Defendant Wood.

67.    During the booking process at the DCCF on or about September 13, 2012, Plaintiff Brewer was interviewed by a nurse. Plaintiff Brewer stated that he had been diagnosed with dysthymia, major depressive disorder, and anxiety disorder with a secondary symptom of insomnia, and that he was also suffering from and undiagnosed chronic back pain.

68.    After requesting to be seen for his chronic back pain, Plaintiff Brewer was seen to by Nurse Robyn Skidmore (hereinafter, "Nurse Skidmore") on or about September 17, 2012. Again the plaintiff explained the nature of his mental health disorders and his chronic back pain. Plaintiff Brewer requested that the WCSO obtain a copy of his medical records from the DCCF, IHC, and the

plaintiff's chiropractor's office. Nurse Skidmore had Plaintiff Brewer sign a medical records release form and stated that they would get Plaintiff Brewer's medical records.

69.    On or about September 18, 2012, Defendant Wood received and entered Plaintiff Brewer's medical records from the DCCF into the WCSO medical database.

70.    On or about September 20, 2012, Defendant Russel received and reviewed Plaintiff Brewer's records from IHC.

71.    At the referral from Nurse Skidmore, Plaintiff Brewer was seen by Defendant Russel on or about September 25, 2012. Defendant Russel explained to the plaintiff that he would provide no other treatment for the plaintiff than that in which Defendant Wood had mandated. Plaintiff Brewer explained that he was presently suing Defendant Wood and that there was a conflict of interest in being subjected to Defendant Wood's care. Plaintiff Brewer asked for alternative treatment. Defendant Russel said he could change which NSAID Plaintiff Brewer was currently taking but would prescribe anything dissimilar to that which was ordered by Defendant Wood. Plaintiff Brewer explained that he had good days and bad days in regards to his pain levels. On the good days, he could function mostly normally, as long as he didn't overdo himself, but on the bad days it hurt to even get out of bed. Defendant Russel discontinued Plaintiff Brewer's Celexa because it wasn't effectively treating his depression and restarted the plaintiff on Zoloft. Defendant Russel refused to provide any treatment for the plaintiff's anxiety disorder or insomnia.

72.    On or about September 26, 2012, Plaintiff Brewer submitted an inmate medical slip requesting medical attention for his chronic back pain.

73.    Plaintiff Brewer was scheduled to be seen by a nurse on or about September 28, 2012, but was unable to make the appointment.

74.    On or about September 28, 2012, Plaintiff Brewer wrote a letter

to Defendant Thompson complaining about the failure to provide him with adequate mental health and medical care, and also about the WCSO's failure to provide him adequate access to a law library or someone trained in the law, as described fully below.

75.   On or about September 29, 2012, Plaintiff Brewer submitted an inmate medical slip requested to be rescheduled to see the missed appointment from September 28, 2012. The response stated that the appointment had already been rescheduled.

76.   On or about September 29, 2012, Plaintiff Brewer submitted an informal grievance through the administrative remedy program (hereinafter, "ARP") complaining about the failure to provide him with adequate mental health treatment for his diagnosed dysthymia, major depressive disorder, anxiety disorder and secondary insomnia (hereinafter, "mental health grievance"). In the mental health grievance, Plaintiff Brewer reviewed his mental health history and the medications used to successfully treat his symptoms. Plaintiff Brewer noted that he had written Defendant Thompson a letter complaining of the failure to provide him with adequate medical care. Plaintiff Brewer requested that the WCSO provide him with adequate mental health care by allowing him to receive his prior treatment that was known to adequately treat his conditions. Plaintiff Brewer wasn't looking for a specific treatment, so long as his symptoms were adequately remedied.

77.   On or about October 1, 2012, Plaintiff Brewer was seen by Nurse Katie Thurston (hereinafter, "Nurse Thurston"). Plaintiff Brewer explained that he was suffering from chronic back pain and explained how on the "good days" it wouldn't hurt very much, but on the "bad days" the pain was considerable. Plaintiff Brewer complained that the NSAID treatment wasn't helping <u>at all</u> with managing the pain. Plaintiff Brewer noted that on the day before, the pain had put him on the floor. Plaintiff Brewer also noted that he

did not want to be seen by Defendant Wood due to the fact that there was a conflict of interest. Instead, Nurse Thurston scheduled Plaintiff Brewer to be seen by Defendant Russel.

78. On or about October 2, 2012, Plaintiff was seen by Defendant Russel and complained of his chronic back pain. The plaintiff reported that the issue started earlier that spring and had been an issue ever since. The plaintiff complained that the NSAID treatment hadn't been effective. Defendant Russel stated that he wouldn't prescribe any other type of treatment than the NSAID treatment which Defendant Wood had already prescribed. Defendant Russel discontinued Plaintiff Brewer's Naprosyn and started the plaintiff on Tylenol.

79. On or about October 4, 2012, Defendant Burton sent Plaintiff Brewer a letter in the form of an official memorandum stating that Defendant Thompson had received Plaintiff Brewer's letter dated September 28, 2012 and had directed him to respond to the plaintiff. Defendant Burton stated that he had provided a copy of the letter to Defendant Wood, who would review the plaintiff's complaint. Defendant Burton noted that "certain medications are not available through our formulary," which was set by Defendant Wood, but alternatives could be prescribed by Defendant Wood. Burton also stated that he had sent Defendant Porter to speak with the plaintiff on October 3, 2012, as discribed fully below, in regards to the facility's law library.

80. Plaintiff Brewer began to see the social workers in helps of dealing with his mental health disorders. There were two social workers who worked at the WCCF: Defendant Perry and a man whose name Plaintiff Brewer does not recall (hereinafter, "John Doe"). Defendant Perry continued to tell Plaintiff Brewer to just take ten breaths to solve any and all of his mental and medical health problems. John Doe, on the otherhand, recommended that the plaintiff start exercising because exercise would help fight the symptoms of the plaintiff's mental health disorders. So, following John Doe's advise, the

plaintiff started going out to the recreation room and did aerobic exercises on his good days.

81. On or about October 5, 2012, Plaintiff Brewer's mother called the WCCF requesting that the plaintiff be allowed to have an MRI for his chronic back pain. Plaintiff Brewer's mother alerted officials that the plaintiff was suffering from neurological symptoms. Plaintiff Brewer's mother explained that the plaintiff was still covered under her insurance plan. The plaintiff's mother was speaking to Nurse Thurston. Nurse Thurson explained to the plaintiff's mother that the WCSO did not allow for outside insurance and that Defendant Wood had not felt it was necessary for the plaintiff to receive an MRI at that time.

82. On or about October 11, 2012, Plaintiff Brewer was seen by Defendant Russel because the Zoloft was not effective in treating the plaintiff's mental health disorders. Plaintiff Brewer asked if he could try a higher dose, believing that perhaps a higher dosage would create the desired remedy to his depression. Defendant Russel agreed and increased the dosage. However, this did not effect the plaintiff's depression.

83. On or about October 11, 2012, Defendant Sekulich responded to the plaintiff's mental health grievance. Defendant Sekulich stated that Trazodone and Wellbutrin were not on the approved medications list, which was set by Defendant Wood. Defendant Sekulich stated that the plaintiff had been prescribed Zoloft and noted that "[i]nsomnia is not a condition that is treated (with medication) at the WCCF." She suggested that the plaintiff should contact the social workers; however, if Defendant Sekulich had even checked, she would have learned that the plaintiff was already working with the social workers. Defendant Sekulich concluded that the plaintiff was receiving adequate medical care.

84. On or about October 12, 2012, Plaintiff Brewer submitted a

formal grievance through the ARP in regards to Plaintiff Brewer's mental
health grievance. The plaintiff complained that the current treatment for his
dysthymia and major depressive disorder was ineffective and that his anxiety
disorder and insomnia were not being treated at all. Plaintiff Brewer stated,
"All I am asking for is for proper, effective treatment for my [mental health
disorders]. All three are diagnosed, pre-existing conditions that need
effective and adequate medical treatments." Plaintiff Brewer offered to pay for
the medications through his family.

85.    On or about October 13, 2012, Plaintiff Brewer submitted an
informal grievance through the ARP complaining of the failure to provide him
with adequate diagnostic tests and pain management treatment required to
diagnose and remedy his chronic back pain (hereinafter, "medical grievance").
Plaintiff complained in the medical grievance of being in pain every day with
spikes of pain that were disabling and left him restricted to his bunk until it
passed. Plaintiff Brewer asked to be sent to the emergency room because he
believed that medical staff at the WCCF, under the direction of Defendant Wood,
whom the plaintiff was actively suing, did not have his best interest in mind.
Plaintiff Brewer requested that the facility take him to see a doctor at the
hospital and to follow the instructions of that physician as to the proper
treatment protocol, "[w]hether through stronger pain meds, therapy, an MRI or
whatever that physician recommends."

86.    On or about October 16, 2012, Defendant Porter responded to
the plaintiff's mental health grievance. Defendant Porter stated that the
plaintiff was being seen to by an AMA (American Medical Association) certified
doctor, namely Defendant Wood, who had deemed that certain medications would
not be prescribed at the WCCF. Defendant Porter stated that the plaintiff would
not receive medications not on the approved medications list. Defendant Porter
stated that the plaintiff's mental health was important to them, presumably the

WCSO, and that if the plaintiff felt that his medication was not working then the plaintiff should work with the social workers. If Defendant Porter had investigated the plaintiff's complaints, he would have learned that the plaintiff was already working with the social workers.

87.    On or about October 18, 2012, Plaintiff Brewer submitted an administrative appeal through the ARP in regards to his mental health grievance to Defendant Thompson. Plaintiff Brewer recounted his medical history at IHC. Plaintiff Brewer pointed out that Defendant Wood was not allowing the plaintiff to receive treatment for his insomnia at all and that the treatment plan for his dysthymia, major depressive disorder, and anxiety disorder was wholly ineffective. Plaintiff Brewer complained of his mental health symptoms that were not being adequately addressed, including: depression, hopelessness, lethargy, down and unmotivated, tired, apathetic, insomnia, and panic attacks. Plaintiff Brewer requested proper medications and a policy change so that inmates who needed medications for the mental health needs could obtain them.

88.    On or about October 18, 2012, Defendant Sekulich responded to Plaintiff Brewer's medical grievance. Defendant Sekulich stated that "ER [sic] visits are initiated under circumstances that would be considered life threatening or if the person is obviously unstable." The policy or custom should have something to effect of "if we are unable to adequately treat your condition at this facility, we will take you to the local hospital for treatment." Defendant Sekulich concluded that since Plaintiff Brewer had been seen by medical staff and had therefore received adequate treatment.

89.    On or about October 25, 2012, Plaintiff Brewer submitted a formal grievance through the ARP in regards to the medical grievance. Plaintiff Brewer complained of serious pain and of how medical staff were treating the issue as though it were a simple headache. Plaintiff Brewer complained of the wanton and unnecessary infliction of pain and requested to be seen by someone

26

who was able to diagnose and prescribe adequate medical treatment for his pain. Plaintiff Brewer requested that since Defendant Wood and his agents were unable and/or unwilling to conduct the necessary tests required to diagnose and treat the plaintiff's chronic pain, then the plaintiff should be allowed to be taken to the local hospital to be seen by someone who could.

90.    On or about October 25, 2012, Plaintiff Brewer was seen by Defendant Russel for his mental health disorders. Defendant Russel reminded the plaintiff that Defendant Wood was the one who set medical standards at the WCCF and that Defendant Russel would not prescribe any treatment that was contrary to the wishes of Defendant Wood. Defendant Russel discontinued the plaintiff's Zoloft and started the plaintiff on Paxil. Defendant Russel also increased the plaintiff's NSAID dosage.

91.    On or about October 25, 2012, Defendant Thompson answered Plaintiff Brewer's administrative appeal in regards to his mental health grievance. Defendant Thompson stated that the prior responses were appropriate and denied the plaintiff's appeal, stating that he relied on Defendant Wood's medical opinion.

92.    On or about November 1, 2012, Defendant Porter responded to Plaintiff Brewer's medical grievance. Defendant Porter stated that Weber County used an AMA certified medical doctor and that while the plaintiff was housed at the WCCF, he would be subjected to Defendant Wood's care. Defendant Porter stated that the plaintiff had no right to a second medical opinion as the plaintiff might have enjoyed prior to his incarceration. Defendant Porter accused the plaintiff of missing doses of his NSAID treatment. This was mostly due to the fact that the plaintiff was at court on some days and on two others he missed Med-Pass because the WCSO had a policy or custom of not announcing when they were doing med-pass. Medical staff would simply open the cuff-port on the housing unit door and anyone who happened to be standing at the door would

get there medications. However, if you were not standing at the door, for
instance if you had gone in your cell to use the restroom, and didn't hear the
soft sound of the cuff-port on the bottom floor open, then you did not get
your medications. Reading the records kept by Weber County, the plaintiff was
well above the 80% compliance in October 2011 as accused by Defendant Porter,
in fact, in September 2011, the plaintiff was 92% complaint, in October 2011,
the plaintiff was 91% compliant, and in November 2011, the plaintiff was 97%
compliant. Furthermore, unlike many medications, NSAIDS do not build up in one's
body for greater effect. If the treatment was effective, when the plaintiff was
mediciated he would not have been in pain. However, the treatment was not
effective and this resulted in the plaintiff's unnecessary suffering.

93.    On or about November 2, 2012, the plaintiff submitted an
administrative appeal through the ARP in regards to his medical grievance.
Plaintiff Brewer complained of pain and noted that the facility didn't have a
specialist on staff. Plaintiff Brewer contended that serious back pain was a
serious medical condition and that the plaintiff should be taken out to be
seen by a specialist. Plaintiff Brewer denied Defendant Porter's assertion
that simply because Defendant Wood was an AMA certified doctor, did not mean
that his actions, inactions, policies, and customs were constitutional.
Plaintiff Brewer requested to be taken to the hospital.

94.    On or about November 7, 2012, Defendant Thompson responded to
Plaintiff Brewer's administrative appeal in regards to the plaintiff's medical
grievance. Defendant Thompson stated that the prior responses were appropriate.
Defendant Thompson stated that he was going to rely on Defendant Wood's opinion.
Defendant Thompson stated that he would not approve the plaintiff to be seen by
another physician unless Defendant Wood agreed to it.

95.    On or about November 21, 2012, Plaintiff Brewer was seen by
Defendant Wood, whom the plaintiff had requested not to be seen by and whom the

plaintiff was actively suing. Defendant Wood noted that the plaintiff had been filing grievance and was asking to be seen by an outside physician. Defendant Wood also stated that he was aware of the plaintiff filing a lawsuit on him. Defendant Wood noted that Brewer was tender in his thoracic spine, but otherwise appeared normal. Defendant Wood discontinued the plaintiff's current NSAID treatment and started the plaintiff on Voltaren, another NSAID. Defendant Wood also put in a recommendation for an MRI on the plaintiff's thoracic spine.

96.     Plaintiff Brewer was scheduled to be taken to an outside physician for an MRI on or about December 4, 2012, but this was never completed.

97.     On or about November 30, 2012, Plaintiff Brewer was seen by a nurse who recommended that the plaintiff be taken off of Paxil and started on Effexor for the plaintiff's depression.

98.     On or about December 6, 2012, Plaintiff Brewer was subjected to a second retaliatory transfer from the WCCF for filing grievances and for writing his elected, as described fully below. The plaintiff was transferred to the SLCMJ where he began to suffer from intestinal bleeding and bloody stool due to the prolonged high doses of NSAIDs.

99.     The Defendants were aware or reasonably should have been aware of the need to be sensative to allegations such as the Plaintiff's because of the fact that Defendant Wood and his agents had allowed a female Immigration and Customs Enforcement (hereinafter, "ICE") pretrial detainee die while she was held at the WCCF just the year before in 2011. The Defendants, especially Thompson and Burton, were aware of the deficiencies in the medical care provided to inmates at the WCCF and at the DCCF under the care of Defendant Wood and his agents, as the case was widely published in the State of Utah. The Deseret News, The Salt Lake Tribune, KSL News, The Standard Examiner, Fox 13 News, and others each ran reports of the death and how the family of Amra Miletic had contacted Defendant Thompson repeatedly before the inmate death

claiming that she was being denied her medications prescribed to her at the IHC McKay Dee Hospital following a heart attack and that Amra Miletic was dying. Defendant Thompson refused to intercede there either and as a result, Amra Miletic died painfully in her cell hours after being turned away by medical staff who refused to provide her adequate medical treatment and denied her requests to go to the hospital. ICE released a press statement on or about March 22, 2011 in which it reported Amra Miletic's death, noting that it was the seventh detainee to die at the WCCF that fiscal year. As a response to Amra Miletic's death, ICE withdrew all of its ICE detainees from the WCCF and transferred them to other county jails in the state, even as far away as St. George in Southern Utah. ICE conducted an audit on the WCCF and Weber County failed miserably. ICE then hired a third-party company to perform a neutral audit and the WCCF again failed miserably. ICE has terminated its contract with Weber County in which it paid a lucrative $55.00 a day per ICE detainee held at the WCCF. It is beyond doubt that the Defendants were well aware of the failures of Defendant Wood and his agents in delivering the necessary medical care to inmates intrusted to his care.

100. When the plaintiff was transferred into the custody of the Federal Bureau of Prisons, he was scheduled for an MRI which was conducted on or about February 26, 2014 at FCI Victorville California. Plaintiff Brewer was diagnosed with two herniated discs in his cervical spine that was pinching the plaintiff's spinal cord and causing the plaintiff to suffer from neuropathy resulting in the plaintiff's symptoms of pain and loss of sensation in his fingers. The plaintiff was prescribed Gabapentin (a psychotropic drug used to treat neuropathy), Amitriptyline (a psychotropic drug used to treat neuropathy), and Meloxican (an NSAID to reduce inflammation). Under the care of the Federal Bureau of Prisons the plaintiff has obtained "adequate" medical care. If an MRI had been ordered by the Defendants in a timely manner, the plaintiff's

30

medical condition would have been diagnosed and proper treatment could have been recommended. However, due to the deliberate indifference of the Defendants, the plaintiff was forced to suffer from serious, chronic pain for months without remedy.

101. Once Plaintiff Brewer was transferred into the custody of the Federal Bureau of Prisons, he was continued in his Effexor treatment, but also prescribed BusPIRone to treat his anxiety disorder symptoms. Furthermore, the plaintiff was having his symptoms of insomnia treated by the side effects of BusPIRone, Gabapentin, and Amatriptyline which cause drowsiness. If the Defendants had provided adequate mental health care, the plaintiff would not have needed to suffer unnecessarily for months from his mental health disorders.

102. At each step in the process, the plaintiff has never refused treatment and attempted to work with his medical care providers to try to remedy his mental and medical health needs.

103. This suit now follows.


## Counts Two, Three, and Four

104. Count Two alleges the denial of access to the courts while the plaintiff was held at the DCCF as a federal pretrial detainee by Defendants Richardson and Manfull. Count Three alleges a retaliatory transfer, sparked by the plaintiff filing suit against the DCSO and their officials, by Defendants Manfull, Jensen, and Richardson. Count Four alleges retaliation by Defendant Manfull for the plaintiff filing a grievance on him.

105. On or about May 22, 2012, Plaintiff Brewer attempted to obtain assistance in filing a pro se civil rights complaint with the District Court in regards to the conditions of his confinement. The DCSO has decided to provide its constitutionally mandated assistance in setting up a small inmate law

library in a private room attached to the inmate library next to Defendant Manfull's office. Plaintiff Brewer submitted an inmate request slip asking for permission to use the law library. Defendant Manfull responded by asking what the plaintiff wanted to use the law library for.

106.   On or about May 24, 2012, Plaintiff Brewer submitted another inmate request slip stating that he wanted to use the law library and that he had a constitutional right to its use. Plaintiff brewer did not want to say that he was planning on filing suit against DCSO officials because of fear of retaliation and furthermore, he didn't think it was any of Defendant Manfull's business what type of legal research the plaintiff wanted to conduct. Defendant Manfull denied the plaintiff's request to use the law library.

107.   Plaintiff Brewer wrote the Clerk of the District Court in Salt Lake City and explained his medical issues and that he had been denied access to the DCCF's law library. The clerk sent the plaintiff a pro se packet and a civil rights packet.

108.   Plaintiff Brewer was a layman at the law and had no previous experience trying to bring forth any allegations in court or what facts would be needed to allege a constitutional violation. In so doing, the civil rights complaint that was filed with the Court on or about June 2, 2012 was severely lacking. Plaintiff Brewer alleged various different allegations but didn't really specify what his complaint was about.

109.   Plaintiff Brewer was granted in forma pauperis status by the Court in or about June 2012.

110.   On or about July 30, 2012, the Court ordered that Plaintiff Brewer amend his complaint, noting that the plaintiff appeared to have been denied any assistance in filing the complaint as he was entitled to under the constitution. The Court ordered that the plaintiff file the amended complaint within 30 days and to cure the listed deficiencies, including the failure to

utilize the law library.

111. In order to comply with the Court's order, Plaintiff Brewer again submitted an inmate request slip to Defendant Manfull asking for permission to use the law library, citing Bounds v. Smith, and stating the fact that the plaintiff now had an open civil action pending in federal court. The next day, Defendant Manfull called the plaintiff out of his housing unit and into the hall. Defendant Manfull proceeded to yell at the plaintiff for quoting case law on his inmate request slip, saying, "Don't tell me how to do my damn job and don't quote me case law!" Plaintiff Brewer explained that he had a right to assistance in filing his legal papers and that Defendant Manfull had already denied the plaintiff access to the law library. Defendant Manfull denied ever refusing the plaintiff law library access. Defendant Manfull handed the plaintiff a "Law Library Application Form." The form specifically stated that law library access was a "privilege" not a right and that the DCSO does not generally approve access to the law library for civil actions. Plaintiff Brewer submitted the application the same day.

112. On or about August 7, 2012, approximately a week after speaking with Defendant Manfull, Plaintiff Brewer submitted an inmate request slip inquiring into the status of the plaintiff's access to the law library. The response stated that the plaintiff would have an answer by the end of the week.

113. On or about August 13, 2012, Plaintiff Brewer submitted another inmate request slip (the inmate request slip functioned also as a grievance form at the DCCF, which answers were non-appealable and final), complaining about Defendant Manfull's conduct. Defendant Manfull intercepted the grievance and on or about August 14, 2012, Defendant Manfull called the plaintiff out of his housing unit and into the hall. Plaintiff Brewer saw that Defendant Manfull had the plaintiff's grievance in his hand. Defendant Manfull yelled at the plaintiff for filing a grievance on him. Defendant Manfull

continued to yell at the plaintiff for quoting case law on the grievance, and saying, "I took a class on case law! I know my damn job! I know what your rights are! Don't tell me what your rights are!" Plaintiff Brewer stood with his arms folded trying to supress a panic attack and was not loud nor disrespectful when he spoke. Defendant Manfull provided the plaintiff with a sheet of paper that stated the days and times the plaintiff had been approved for access the law library.

114.   Plaintiff Brewer submitted an inmate request slip grieving Defendant Manfull's conduct and addressed it to Defendant Jensen. This grievance was never responded to.

115.   When Plaintiff Brewer was given access to the law library, which was twice a week for ninety minutes, he discovered that the only resources available to him were criminal law volumes published in 1991 (twenty years out of date), a computer with limited federal law resources that hadn't been updated since 2005 (seven years out of date), and the capacity to use Microsoft Word to type legal materials, but if the plaintiff wished to have anything printed, he'd have to consent to letting Defendant Manfull read the documents. This law library provided no assistance to the plaintiff in preparing a civil rights complaint to be submitted to the Court. Instead, the plaintiff hand-wrote the amended complaint, fearing that Defendant Manfull would retaliate if he were allowed to read the complaint prior to it being filed with the Court. The Court Clerk filed the amended complaint on August 28, 2012.

116.   The following week, Plaintiff Brewer was in the law library preparing summons for his civil rights suit when Defendant Manfull discovered that the plaintiff was naming him as a defendant in the action. Defendant Manfull then discontinued the plaintiff's current access to the law library.

117.   By information and belief of the plaintiff, Defendant Manfull

contacted Defendants Jensen and Richardson and the three of them had Plaintiff
Brewer transferred from the DCCF in retaliation for naming Defendants Manfull
and Richardson as defendants in his suit.

118.   Plaintiff Brewer was transferred from the DCCF on or about
September 13, 2012 by the USMS and booked into the WCCF.

119.   As a direct and foreseeable result of being denied adequate
assistance in preparing his legal work, the plaintiff was unable to research
the nature of his claims of the failure to provide medical and mental health
care, denial of access to the courts, and, as asserted in the plaintiff's 2012
lawsuit, the sexual harassment by Deputy Parr. As a result the complaint that the
plaintiff ended up filing could have stood up to the requirements of the law or
the subjection to a motion to dismiss, despite the merits of the case.
Ultimately, Plaintiff Brewer had to abandon the lawsuit in February 2013
because he was unable to successfully prosecute the case.

120.   Defendant Richardson was the policy maker who instituted the
law library at the DCCF while the plaintiff was held there as a federal pretrial
detainee, and Defendant Richardson was ultimately tasked with ensuring that
inmates held at the DCCF had adequate assistance in accessing the courts. As he
failed in providing an adequate law library for the plaintiff to use and
provided no alternative by persons trained in the law, and by creating a policy
or custom of denying inmates access to the assistance required of their housing
institution unless they already had an open pro se case, he is liable for
damages for the constitutional breach. Plaintiff Brewer could have obtained
adequate relief for his mental health and medical care needs if he had been
able to timely research and file documents with the Court.

121.   This suit now follows.

//

//

## Counts Five and Six

122.   Count Five alleges that the WCSO's policy of restricting all outgoing, non-legal mail sent by inmates held at the WCCF to people outside of the jail unless it is written on a generic postcard violated the plaintiff's rights to free speech and due process of law. Count Six alleges that the WCSO's policy of restricting all incoming, non-legal correspondence sent to inmates held at the WCCF from people outside of the jail unless it was written on a generic postcard violated the plaintiff's rights to free speech and due process of law.

123.   On or about September 13, 2012, Plaintiff Brewer was transferred from the DCCF to the WCCF in retaliation for his filing suit.

124.   Once at the WCCF, Plaintiff Brewer learned that the WCSO had a policy instituted by Defendant Thompson that censored all incoming and outgoing non-legal mail sent to or sent by inmates held at the WCCF to the use of a generic postcard (hereinafter, "postcard-only policy"). According to the postcard-only policy, postcards had to be purchased from the U.S. Post Office, the WCSO, or from the WCCF's commissary. There are only two exceptions to the postcard only policy: (1) letters sent to or sent by the courts or the inmate's attorney on record that is marked "Legal Mail;" and (2) under special circumstances, an inmate might be able to receive non-legal, non-postcard mail if the inmate first made a written request to Defendants Burton or Porter, stating the reason why an exception should be made, and then if granted, the exception would only be honored if either Defendants Burton or Porter sent a written notice to the mailroom granting the exception prior to the letter being received at the WCCF.

125.   As a direct and foreseeable result of having to abide by the postcard only policy, Plaintiff Brewer was forced to lose contact with many of his friends and family simply because they were unwilling to jump through the

extra hurdles in order to correspond with him. Furthermore, Plaintiff Brewer
lost his ability to manage his own affairs outside of the WCCF in preparation
for a long legal battle and the possibility of a lengthy prison sentence. He
was unable to send or receive secure information, such as: social security
numbers, bank account information, passwords, etc., because such information
would be broadcast to the public when written on a postcard. The postcard-only
policy greated restricted Plaintiff Brewer's ability to correspond with the
outside world. The policy prevented his friends and family from sending him
items that would normally have been appropriate for an inmate to receive as a
federal pretrial detainee if he were held at a federal detention center
hereinafter, "FDC") or in the state prison or in other county-run jails in the
area, such as the DCCF or the Salt Lake County Metro Jail (hereinafter, "SLCMJ");
items such as: family photographs; drawings; copies of bills; medical records or
doctor's reports; spiritual and religious tracts and pamphlets; printed articles
from newspapers; magazines, or from the internet; etc., in addition to
preventing educational, community, and religious organizations from sending him
lessons, books, and periodical offers to him, and it also prevented him from
seeking fundraising appeals from the public. Furthermore, it created a great
hurdle for the thoughtful and constructive written communication between the
plaintiff and his friends and family.

     126.   On or about October 14, 2012, Plaintiff Brewer submitted an
informal grievance through the ARP challeging the postcard-only policy, stating
that the policy was an unnecessary violation of his constitutional rights.

     127.   On or about October 18, 2012, Defendant Sekulich responded to
the grievance stating that the postcard-only policy didn't prevent correspondence
with the plaintiff's family and that they provided phones; visitation; and
pay-per-use, text-only e-mail services. Defendant Sekulich concluded, "You may
not agree with the policy, but you must comply with it."

128.   On or about October 23, 2012, Plaintiff Brewer submitted a formal grievance through the ARP. Plaintiff Brewer complained that the policy violated his constitutional rights and that he could not see a reason for the intrusion because all incoming mail would be searched for contraband anyway. Plaintiff Brewer called for a change in policy.

129.   On or about October 25, 2012, Defendant Porter responded to Plaintiff Brewer's grievance. Defendant Porter contended that because inmates were allowed visitation, phone access, and mail, the policy was therefore valid. Defendant Porter stated that the postcard-only policy had been upheld by the courts.

130.   Plaintiff Brewer submitted an administrative appeal through the ARP on or about October 29, 2012. Plaintiff Brewer continued to state that the policy violated his constitutional rights.

131.   On or about October 30, 2012, Defendant Thompson responded to the plaintiff's appeal. Defendant Thompson stated that under the WCCF policy that the plaintiff's mail was not afforded any privacy rights, except for mail designated as privileged. Defendant Thompson stated that the courts have held that the plaintiff's rights could be limited or "retracted" for legitimate reasons. Defendant Thompson noted that Plaintiff Brewer had access to telephones, visitation, and pay-per-use, text-only e-mail.

132.   During an encounter with Defendant Porter, on or about October 3, 2012, Defendant Porter stated that the purpose behind the WCSO's mail policies was to make life uncomfortable for inmates held at the WCCF in an effort to make them not want to return to jail.

133.   This suit now follows.


## Count Seven

134.   Count Seven alleges that the WCSO's policy that banned all

38

magazine publications mailed to inmates held at the WCCF violated the plaintiff's rights of free speech and due process of law.

135.   On or about September 13, 2012, Plaintiff Brewer was transferred from the DCCF to the WCCF in retaliation for filing suit.

136.   Once at the WCCF, Plaintiff Brewer learned that the WCSO had a policy instituted by Defendant Thompson that completely banned all magazine publications sent to inmates held at the WCCF through the mail (hereinafter, "magazine-ban policy").

137.   Plaintiff Brewer is a member of the Church of Jesus Christ of Latter-Day Saints. The backbone of our religion stems from the belief that God has revealed himself to man in these latter-days and that he heads our church through the ordained leaders who act at his direction. These men and women in various ecclesiastical positions in the hierarchy of the church are tasked with leading the members of the church in following the will of God. They provide sermons and directions actively throughout the year. These sermons and directions are published in various church-owned magazine publications targeting different age groups, for example: The Liahona is a magazine publication targeted toward children and families who have young children, the New Era is a magazine publication targeted toward youth and families with adolescent children, and the Ensign is targeted toward adults. Plaintiff Brewer has a sincerely held religious belief in listening to the guidance of his church leaders, and had a subscription to the Ensign magazine. The plaintiff has the subscription even now.

138.   Plaintiff Brewer also had various interests in reading entertainment magazines available to individuals through the mail.

139.   As a federal pretrial detainee, if the plaintiff had been held at an FDC, or in other local, county-run jails, such as the DCCF or the SLCMJ, the plaintiff would have been allowed to receive and read such magazine

publications.

140. On or about October 3, 2012, Plaintiff Brewer submitted an informal grievance through the ARP contesting the censorship of all magazine publications. Plaintiff Brewer complained that it was an unjustified violation of his constitutional rights.

141. On or about October 17, 2012, Defendant Sekulich responded to Plaintiff Brewer's grievance, stating that the jail maintained the authority and discretion to decide what items were allowed into the facility. Defendant Sekulich stated, "I'm sure that you realize that persons that are incarcerated do not enjoy the same freedoms that they would if they were not incarcerated. This is the nature of being in jail." Defendant Sekulich also stated that reading a copy of the Ensign was not necessary in order to practice the plaintiff's religion, despite it being inappropriate for a corrections employee to decide for an inmate what is and is not a sincerely held religious practice.

142. On or about October 24, 2012, Plaintiff Brewer submitted a formal grievance through the ARP. Plaintiff Brewer stated that he a right to receive publications in the mail and the publisher had a right to send them to him. Plaintiff Brewer also stated that a person does not lose all of their constitutional rights simply because they are booked into a jail. The plaintiff called for a change in policy.

143. On or about October 25, 2012, Defendant Porter responded to Plaintiff Brewer's grievance stating that alot of magazines contained staples and that staples were not allowed into the facility.

144. On or about October 29, 2012, Plaintiff Brewer submitted an administrative appeal through the ARP. Plaintiff Brewer complained that the complete ban on all magazine publications was an unjustified violation of his constitutional rights. Plaintiff Brewer suppled an easy and simple alternative to the complete ban on all magazine publications in the form of simply removing

40

the staples with a staple puller. This was already a practice exercised by mailroom staff in regards to staples coming into the facility in legal mail. The plaintiff called for a change in the policy.

145.    On or about October 30, 2012, Defendant Thompson responded to Plaintiff Brewer's administrative appeal. Defendant Thompson stated that the previous responses were appropriate. Defendant Thompson stated that the WCCF had the responsibility of controlling the property that was received and stored at the WCCF. Defendant Thompson stated that the jail library had books on religion and other topics that the plaintiff had access to. The plaintiff did not in fact have access to the jail library, as the housing unit that the plaintiff was housed in did not have permission to walk around the jail. Instead, a book cart with approximately fifty books would be wheeled into the plaintiff's housing unit about every other week, sometimes every week. The books were almost all written in Spanish, a language that the plaintiff neither spoke nor read. These books would not provide an adequate alternative to the plaintiff's need to have access to magazine publications sent to him through the mail.

146.    During an encounter with Defendant Porter, on or about October 3, 2012, Defendant Porter stated that the purpose behind the WCSO's mail policies was to make life uncomfortable for inmates held at the WCCF in an effort to make them not want to return to jail.

147.    This suit now follows.


Counts Eight and Nine

148.    Counts Eight and Nine are alternative causes of action arising out of the same events and the Court or jury may find for the plaintiff on either count or both. Count Eight alleges that the WCSO's policy of requiring inmates held at the WCCF to agree to donate books sent to them in the mail to

41

Weber County amounts to a violation of the plaintiff's rights to free speech and due process of law. Count Nine alleges that the policy amounts to extortion in violation of 18 U.S.C. §§ 1951, 1962, and 1964.

149. On or about September 13, 2012, Plaintiff Brewer was transferred from the DCCF to the WCCF in retaliation for the plaintiff filing suit against DCSO officials.

150. Once at the WCCF, Plaintiff Brewer learned that the WCSO had a policy implemented by Defendant Thompson that required inmates held at the WCCF to donate books sent to them in the mail to Weber County before staff would agree to deliver the books to the inmate-addressee (hereinafter, "book-donation policy"). Under the book-donation policy, if the inmate for whom the books were intended refused to agree to donate the book to Weber County, then staff would refuse to deliver the books to the inmate and instead place the book in the inmate's property locker until the inmate was transferred or released from the WCCF. No written notice would be provided to either the inmate or the sender of a book being rejected because of the inmate refusing to donate the book to Weber County. Furthermore, there was no opportunity for the inmate or the sender to contest the decision to withhold the books.

151. On or about October 3, 2012, Plaintiff Brewer reported to mail call where Defendants Miller and Collingsworth were handing out the mail in the plaintiff's housing unit. On that day Plaintiff Brewer had two packages addressed to him from his attorney, Ms. Neider's office. Defendant Collingsworth opened the envelopes in the plaintiff's present pursuant to the mail policies regarding legal mail. Within the packages were some loose paper-work and five books. Defendant Collingsworth handed the loose paperwork, but seized the books stating that the books would have to be inspected by Defendant Porter and the plaintiff would have to agree to donate them to Weber County before he would be allowed to receive them. Defendants Miller and Collingsworth

42

then left the plaintiff's housing unit with the five books. Plaintiff Brewer was never given written notice of Defendants Miller's and Collingsworth's decision to censor his legal mail or the chance for him or Ms. Neider to contest the censorship. The books were: (1) Steven H. Gifis, BARRON'S LAW DICTIONARY (2010); (2) Michael Agnes, WEBSTER'S NEW WORLD DICTIONARY (2009); (3) unknown author, WEBSTER'S CLASSIC REFERENCE LIBRARY THESAURUS (unknown publication date); (4) unknown author, FEDERAL CIVIL RULES BOOKLET (2012 Ed.); and (5) Paul Bergman & Sara Berman, NOLO'S CRIMINAL LAW HANDBOOK: KNOW YOUR RIGHTS, SURVIVE THE SYSTEM (12th Ed., 2011).

152.   On or about October 3, 2012, Plaintiff Brewer submitted an informal grievance through the ARP (hereinafter, "legal mail grievance"). Plaintiff Brewer stated that the actions of Defendants Miller and Collingsworth amounted to a violation of attorney-client privilege and a violation of his constitutional rights. Plaintiff Brewer stated that the legal materials were meant for him to use in his ongoing legal battles and that they were sent by his attorney in an attempt to assist him in that pursuit.

153.   On or about October 5, 2012, Plaintiff Brewer was called into the hall by Defendant Porter from the plaintiff's housing unit. At which point, Defendant Porter extorted three of the five books from the plaintiff under the guise of a "privilege contract" where if the plaintiff agreed to donate the books to Weber County then Defendant Porter would allow the plaintiff to receive and possess the remaining two books without having to donate them to Weber County. Defendant Porter stated that if the plaintiff refused, then he would take all five books and place them in the plaintiff's property locker until the plaintiff was transferred or released from the WCCF. The plaintiff stated that it was extortion. Defendant Porter told the plaintiff to call it whatever he wanted, but the plaintiff still had a choice to make. The books extorted from the plaintiff at that time were (1) Barron's Law Dictionary,

(2) Webster's New World Dictionary, and (3) Webster's Classic Reference Library Thesaurus. In exchange, the plaintiff got to receive and retain ownership of the Federal Civil Rules Booklet and Nolo's Criminal Law Handbook. During this encounter, Defendant Porter also stated that the purpose behind the mail policies was to make it more uncomfortable for inmates at the WCCF in an effort to make them not want to return to jail.

154.   On or about October 12, 2012, Plaintiff Brewer submitted an informal grievance under the ARP contesting the book donation policy (hereinafter, "book donation grievance"). Plaintiff Brewer stated that the book donation policy was extortion and a violation of his constituional rights. Plaintiff Brewer called for a change in policy.

155.   On or about October 14, 2012, Defendant Sekulich responded to Plaintiff Brewer's legal mail grievance. Defendant Sekulich stated that legal books didn't meet the standard for legal privilege under the WCSO's policy. Defendant Sekulich referred to the book donation policy and the WCSO's policy on privileged correspondence.

156.   On or about October 14, 2012, Defendant Bonyai called Plainti Plaintiff Brewer over the intercom in the plaintiff's cell, where Defendant Bonyai then extorted the plaintiff by threatening to withhold two books that were sent to him in the mail if the plaintiff didn't agree to donate them to Weber County. Plaintiff Brewer agreed under protest. Defendant Bonyai then delivered the books to the plaintiff. The books were (1) Rick Riordon, THE SON OF NEPTUNE (unknown publication date) and (2) Rick Riordon, THE MARK OF ATHENA (unknown publication date).

157.   On or about October 15, 2012, Plaintiff Brewer submitted a formal grievance through the ARP in regards to the legal mail grievance. Plaintiff Brewer complained of the violation of his constitutional rights and the violation of his attorney-client privilege. Plaintiff Brewer claimed that

Defendants Miller and Collingsworth violated his rights by seizing his legal materials from his legal mail and that Porter further violated his rights by extorting the books from him.

158. On or about October 17, 2012, Defendant Sekulich responded to Plaintiff Brewer's book donation grievance. Defendant Sekulich stated that the WCCF was responsible for a large inmate population and a large quantity of property. Defendant Sekulich stated that the WCCF had the authority and discretion over what was allowed into the facility. Defendant Sekulich stated, "That is the nature of a jail environment. Of course you dot not enjoy the same freedoms that you would if you were not incarcerated. You are being held (at the WCCF) by a lawful order from a federal judge." Defendant Sekulich said that Plaintiff Brewer could "opt out" of having to donate the books by having them placed in his property locker "where they will be stored until you move to another facility or are released from the WCCF." Defendant Sekulich also stated that the plaintiff could always tell his friends and family to stop sending him books. Defendant Sekulich directed Brewer to the use of the jail library, if he had a security rating low enough, or the use of the book cart. However, as stated above, the book cart contained approximately 50 books and mostly in Spanish that was delivered to the plaintiff's housing every other week but sometimes every week. The book cart was not an adequate alternative for the plaintiff because the plaintiff could not read or speak Spanish.

159. On or about October 17, 2012, Defendant Porter responded to Plaintiff Brewer's legal mail grievance, even though it was inappropriate for him to do so since the plaintiff was grieving Defendant Porter. Defendant Porter rejected the plaintiff's contention that the books were legal materials and stated that the books were properly taken pursuant to the book donation policy.

160. On or about October 17, Plaintiff Brewer submitted a formal

45

grievance through the ARP in regards to the book donation grievance. The plaintiff continued to state that the policy violated his constitutional rights and that it amounted to extortion.

161.    On or about October 18, 2012, Plaintiff Brewer submitted an administrative appeal through the ARP in regards to the legal mail grievance. Plaintiff Brewer complained that the taking of items from his legal mail and then extortion the plaintiff for the use of those items amounted to a violation of his constitutional rights.  The plaintiff called for a policy change.

162.    On or about October 18, 2012, Defendant Porter responded to Plaintiff Brewer's formal grievance in regards to the book donation policy. Defendant Porter stated that the plaintiff had not been extorted, but had simply been required to make a choice. Ported noted that there was an easy alternative to the plaintiff having to donate books to Weber County: Do not have books sent to him in the mail.

163.    On or about October 23, 2012, Plaintiff Brewer submitted an administrative appeal through the ARP in regards to the book donation grievance. Plaintiff Brewer complained that the policy was in the wrong and that it amounted to extortion and violated his constitutional rights. The plaintiff called for the policy to be changed.

164.    On or about October 30, 2012, Defendant Thompson responded to the plaintiff's appeal in regards to the book donation grievance. Defendant Thompson stated that the prior responses were appropriate. Defendant Thompson stated that the WCCF had the responsibility to control property that was received and stored by inmates.

165.    On or about October 30, 2012, Defendant Thompson responded to the plaintiff's appeal in regards to the legal mail grievance. Defendant Thompson stated that legal books didn't constitute legal communication between an inmate and an attorney because the book was the "intellectual property of

the copyright owner." Defendant Thompson stated that the WCCF policies did not damage Plaintiff Brewer's right to secure communication with his attorney.

166.    On or about November 9, 2012, Defendant Sekulich called Plaintiff Brewer over the intercom in the plaintiff's cell, where she informed the plaintiff that three books had arrived for him in the mail. Defendant Sekulich then extorted the plaintiff by threatening to withhold the books, pursuant to the book donation policy, if the plaintiff didn't agree to donate the books to Weber County. Plaintiff Brewer agreed under protest. Defendant Sekulich delivered the books to the plaintiff. The books were (1) Rick Riordon, THE SERPANT'S SHADOW (unknown publishing date); (2) Rick Riordon, THE THRONE OF FIRE (unknown publication date); and (3) Gerald N. Lund, THE FIRE OF THE COVENANT (unknown publication date).

167.    On or about November 18, 2012, Defendant Miller called Plaintiff Brewer over the intercom in the plaintiff's cell, where he informed the plaintiff that a book had come for him in the mail. Defendant Miller then extorted the plaintiff by threatening to withhold the book, pursuant to the book donation policy, if the plaintiff didn't agree to donate the book to Weber County. Plaintiff Brewer agreed under protest. Defendant Miller then brought the book to the plaintiff. The book was: unknown author, DRAWING ON THE POWERS OF HEAVEN (unknown publication date).

168.    On or about December 4, 2012, Defendant Sekulich called Plaintiff Brewer over the intercom in the plaintiff's cell, where she informed the plaintiff that a book had come for him in the mail. Defendant Sekulich then attempted to extort the plaintiff by threatening to withhold the book if the plaintiff didn't donate the book to Weber County. However, Plaintiff Brewer refused, stating that he was done playing the Defendants' extortionate games and that he would no longer "donate" his personal property to Weber County under threat. Defendant Sekulich then came to the plaintiff's cell and

again attempted to extort the book from the plaintiff, but the plaintiff again refused to be extorted. The book was then placed in the plaintiff's property locker to be withheld from the plaintiff until he left the WCCF or was released. The book was: Glenn Beck, AGENDA 21 (2012).

169.   Plaintiff Brewer had a number of other books extorted from him by the Defendants pursuant to the book donation policy while the plaintiff was held at the WCCF as a federal pretrial detainee between the dates of on or about September 13, 2012 through on or about December 6, 2012. These books included: (1) The Church of Jesus Christ of Latter-Day Saints, THE HOLY BIBLE (unknown publication date); (2) The Church of Jesus Christ of Latter-Day Saints, THE BOOK OF MORMON/DOCTRINE & COVENANTS/PEARL OF GREAT PRICE (unknown publication date); and (3) Gerald N. Lund, THE WORK AND THE GLORY: VOLUME THREE (unknown publication date).

170.   While held at the WCCF as a federal pretrial detainee, the plaintiff was deprived of his personal property mailed to him through the U.S. Postal Service through extortion. The property had been purchased from companies that engaged in interstate commerce both inside and outside of the State of Utah.

171.   If the plaintiff had been held at a FDC or at other local county-run jails, such as the DCCF or the SLCMJ, he would have been able to receive books sent to him without any issues or extortions.

172.   This suit now follows.


Counts Ten and Eleven

173.   Count Ten alleges the denial of access to the courts in violation of the plaintiffs rights of free speech, petitioning the government for a redress of grievances, and due process of law. Count Eleven alleges the retaliatory transfer of the plaintiff in violation of Plaintiff Brewer's rights

to free speech, petition the government for a redress of grievances, and due process of law.

174.   On or about September 13, 2012, Plaintiff Brewer was transferred from the DCCF to the WCCF in retaliation for his filing suit.

175.   On or about September 25, 2012, Plaintiff Brewer submitted an inmate request asking for permission to go to the WCCF's law library, as Weber County has chosen not to provide inmates held at the WCCF with adequate assistance by persons trained in the law in filing meanful papers with the courts contesting the nature of their convictions or the conditions of their confinement. The plaintiff noted that he had an open federal civil action pending and that he was appearing pro se. The same day, Defendant Porter responded, stating, "We do not have a law library for you to visit at this facility. We have a limited supply of legal reference books and we utilize the internet. If there is a specific reference you are looking for we will do our best to find it for you."

176.   On or about September 26, 2012, Plaintiff Brewer submitted a grievance through the ARP (hereinafter, "law library grievance"). The plaintiff complained that he was being denied access to an adequate law library or adequate assistance from persons trained in the law. Plaintiff Brewer stated that he was a pro se litigant and stated his case name and number. The plaintiff noted that he was not trained in the law and that he had an ongoing need to perform legal research and to take notes. Plaintiff Brewer stated that he had requested access to the WCCF's law library from Defendant Porter. The plaintiff requested access to local, state, and federal laws, statutes, and regulations and access to a means of looking up case law.

177.   On or about September 28, 2012, Plaintiff Brewer submitted an inmate request asking for various legal reference materials on tort law, the deliberate indifference standard, and asked for a copy of the Georgetown Law

Journal (a title that he requested at the suggestion of another inmate), a federal citator, the Key Index for the Westlaw Digest (another title that he requested at the suggestion of another inmate), and an address to the Tuesday Night Bar (a local meet-up group through the Utah Bar of attorneys who provide legal advise pro bono to pro se litigants. Plaintiff Brewer noted that he was a pro se litigant and cited his case number. Defendant Porter responded the same day, stating that the plaintiff needed to be more specific and provide proper citation for his requests and also provided the plaintiff with the address to the Tuesday Night Bar.

178.   On or about September 28, 2012, Plaintiff Brewer wrote a letter to Defendant Thompson complaining abou the level of medical care he was receiving at the WCCF (as described fully above) and complained that he was being denied adequate access to the law library.

179.   On or about October 3, 2012, Defendant Porter called Plaintiff Brewer out of his housing unit and into the hall. Defendant Porter explained that there was no law library at the WCCF and that he believed that the plaintiff was receiving adequate assistance because there were some legal reference books available to him, if he could simply cite the exact ones he wanted or provided the exact citation for the specific cases in which he wanted printed off of the computer for him for a fee of fifty cents per page. Plaintiff Brewer asked if he could see the information before having it printed or before deciding to pay the fifty cents per page fee to decide if the information was even relevant to his pursuits. Defendant Porter said no and further stated that Weber County been sued by inmates in the past and that his job was to insure that inmates held at the WCCF would not be able to sue the County again in the future. Plaintiff Brewer requested physical access to the legal resources, but Defendant Porter refused. Defendant Porter explained that the WCSO used a system where inmates held at the WCCF could request one legal reference book a week,

if the inmate could specifically cite which book they wanted. Plaintiff Brewer asked for an inventory list of the legal reference books that the WCSO had in stock. Defendant Porter refused. When the plaintiff asked how he could know what the WCSO had if he had no physical access to the materials and no access to an inventory list. Defendant Porter chuckled and reminded the plaintiff that it was Defendant Porter's job to ensure that inmates held at the WCCF could not sue Weber County again. Defendant Porter brought up the plaintiff's previous request for legal research materials and stated that he would be happy to print those topics off of the computer for the plaintiff at a cost of fifty cents per page, but noted that it would be hundreds of pages of material. The plaintiff asked for a waiver of the fifty cent fee or the ability to see the material before being forced to pay the fee. Defendant Porter refused. Defendant Porter provided the plaintiff with a copy of the Georgetown Law Journal: Criminal Procedure (2005 Ed.) because it was the only legal reference book that the plaintiff had requested by exact name.

180.   On or about October 4, 2012, Plaintiff Brewer received a letter from Defendant Burton in response to the plaintiff's letter to Defendant Thompson. Defendant Burton stated that Defendant Thompson had received the plaintiff's letter and had directed that Defendant Burton respond. Defendant Burton stated that he had sent Defendant Porter to speak with the plaintiff on or about October 3, 2012 regarding inmate legal activities.

181.   On or about October 6, 2012, Defendant Sekulich responded to the law library grievance. Defendant Sekulich stated, "The WCCF is not required to have a room for you to go and peruse law books. It is required to give you access to a law library." Defendant Sekulich stated that staff had explained to the plaintiff the process of obtaining legal reference materials and that the plaintiff need only request what information he needed, but the "request must be specific; however."

182.    On or about October 12, 2012, Plaintiff Brewer submitted a formal grievance through the ARP in regards to the law library grievance. The plaintiff complained about the "exact cite" system (also sometimes known as a "runner system" or a "cell delivery system") that the WCSO used for legal resources and how it was time consuming and unproductive. Plaintiff Brewer complained that the runner system wasn't adequate and challeged that it was actually an attempt to bar all but the most wealthy inmates from accessing the courts.

183.    On or about October 15, 2012, Plaintiff Brewer submitted an informal grievance through the ARP (hereinafter, "copy fee grievance"). The plaintiff complained that he was a pro se litigant in federal court and that he had already been granted leave to proceed in forma pauperis; and complained that the fifty cent per page fee to get legal reference materials for legal research barred him access to the information. Plaintiff Brewer called for a policy change or an exemption made for pro se litigants.

184.    On or about October 16, 2012, Plaintiff Brewer submitted an inmate request to Defendant Porter asking for the Westlaw Digest for "medical." Defendant Porter responded the same day, stating that there was no such book for medical. Plaintiff Brewer submitted another inmate request to Defendant Porter asking for the Westlaw Digest for "deliberate indifference." Defendant Porter responded the same day, stating, "You need to be more specific. There is not a book with the title 'deliberate indifference.'" Plaintiff Brewer submitted another inmate request to Defendant Porter asking for the "D Section" of the Westlaw Digest. Defendant Porter responded the same day, stating, "There is no 'Section D.'"

185.    On or about October 16, 2012, Defendant Porter responded to Plaintiff Brewer's law library grievance. Defendant Porter Stated:

Utah Jail Standards as well as court precedence are clear

that you are entitled access to an "adequate law library or adequate assistance from persons trained in the law." (Bounds-v-Smith; emphasis added). Weber County is committed to providing you the legal access you are allowed. Weber County has chosen to allow you access to both the books that we have in stock, as well as online information accessed mainly (but certainly not solely) through VersusLaw. Because we have an adequate law library, we are not required to provide you with someone "trained in the law".

Neither the courts nor Utah Jail Standards dictate that there must be a room for you peruse [sic] books.

Defendant Porter continued by directing the plaintiff to request what specific information he wanted and if it was available, it would be supplied to him, but included, "Policy also requires that you be as specific as possible when you make the request."

186.   On or about October 17, 2012, Plaintiff Brewer submitted an inmate asking for the volume of the Westlaw Digest that handled topics beginning with the letter D so he could look up "deliberate indifference."

187.   On or about October 18, 2012, Plaintiff Brewer submitted an administrative appeal through the ARP in regards to the law library grievance. Plaintiff Brewer complained that the runner system/exact cite system which only allowed him to check out one legal book per week was greatly restrictive and hindered the plaintiff's access to the courts because it made performing legal research nearly impossible. Plaintiff Brewer complained that he did not in fact have access to VersusLaw, despite Defendant Porter's contentions that the plaintiff simply request the case he was looking for, because the plaintiff had no means of providing the exact citation for the materials that he wanted. The plaintiff called for a change in policy so that inmates held at the WCCF could have physical access to the law library.

188.   On or about October 18, 2012, Defendant Sekulich responded to the plaintiff's copy fee grievance. Defendant Sekulich referred the plaintiff to a memorandum signed by Defendant Thompson stating that all copies made for inmates would be charged to the inmate at a rate of fifty cents per page copied.

189.    On or about October 19, 2012, Defendant Porter responded to Plaintiff Brewer's inmate request for Volume D of the Westlaw Digest. Defendant Porter stated that the Westlaw Digest was not set up alphabetically so there was no volume for "D" and asked for a specific volume that the plaintiff wanted. Plaintiff Brewer submitted an inmate request asking for the Westlaw Digest "Descriptive Word Index" (a volume recommended to the plaintiff by another inmate). Defendant Porter responded the same day inquiring if the plaintiff wanted the volume for "deliberate indifference." Plaintiff Brewer submitted an inmate request stating, "No. So I can figure out the terms and books that I need so we can avoid this pingpong [sic] communication and streamline this process." Defendant Porter responded the same day, stating, "The only problem Mr. Brewer, there are multiple Descriptive Word Indexes." The plaintiff submitted an inmate request asking for the "1st Descriptive Word Index book."

190.    On or about October 22, 2012, Defendant Porter responded to Plaintiff Brewer's inmate request stating that the plaintiff could receive the first volume of the Descriptive Word Index of the Westlaw Digest. An officer brought the book to the plaintiff later that day.

191.    On or about October 23, 2012, Plaintiff Brewer submitted a formal grievance through the ARP in regards to the copy fee grievance. The plaintiff complained of not being able to view the materials being printed for legal research prior to deciding if it was even relevant to his needs. The plaintiff called for a change in the policy.

192.    On or about October 23, 2012, Plaintiff Brewer submitted an inmate request asking for volume two of the Descriptive Word Index of the Westlaw Digest, finding the first volume unuseful. Defendant Porter responded to the plaintiff's inmate request the same day stating that the plaintiff could receive the copy. An officer brought the second volume to the plaintiff later that same day.

193.   On or about October 24, 2012, Plaintiff Brewer submitted an inmate request asking for the third volume of the Descriptive Word Index of the Westlaw Digest. Defendant Porter responded the same day asking, "What word are you looking for?" The plaintiff didn't really know, but submitted an inmate request stating, "Several. Its a complex case."

194.   On or about October 25, 2012, Defendant Porter responded to the plaintiff's inmate request, stating, "Great, so where would you like to start?"

195.   On or about October 25, 2012, Defendant Porter responded to the plaintiff's copy fee grievance. Defendant Porter stated that Weber County policy was clear on the subject and referred the plaintiff to the same memorandum signed by Defendant Thompson as had Defendant Sekulich.

196.   On or about October 25, 2012, Defendant Thompson responded to the plaintiff's administrative appeal in regards to the plaintiff's law library grievance. Defendant Thompson noted that the plaintiff's grievance was in regards to his not being given physical access to a law library. Defendant Thompson stated that the prior responses were appropriate.

197.   On or about October 27, 2012, Plaintiff Brewer submitted an inmate request asking for the third Descriptive Word Index of the Westlaw Digest. The same day, Defendant Porter responded stating, "[D]one." An officer brought the third volume to the plaintiff later that day.

198.   On or about Octover 28, 2012, Plaintiff Brewer submitted an administrative appeal through the ARP in regards to the copy fee grievance. Plaintiff Brewer noted that he was a pro se litigant proceeding in forma pauperis in federal court. Plaintiff Brewer complained that he was not being provided physical access to the facility's law library nor was he being allowed to review the information to be printed prior to his agreeing to paying for the copies. Plaintiff Brewer complained that such a burden was to great for the

average pro se litigant, especially someone proceeding in forma pauperis. The plaintiff called for a change in policy to a more reasonable cost of five or ten cents per page (instead of fifty cents per page) or to have the policy abolished.

199.    On or about October 31, 2012, Plaintiff Brewer submitted an inmate request to Defendant Porter requesting a federal 550 form.

200.    On or about November 1, 2012, Defendant Porter responded to the plaintiff's inmate request, stating, "The only thing I can find under 'federal 550 form' is a publication from the IRS titled 'Investment Income and Expenses" that [sic] publication is 79 pages long. Is that what you are looking for?" Plaintiff Brewer submitted an inmate request the same day stating that a federal 550 form was the standard form for a § 1983 action.

201.    On or about November 1, 2012, Defendant Thompson responded to Plaintiff Brewer's administrative appeal in regards to the copy fee grievance. Defendant Thompson stated that he believed Plaintiff Brewer was complaining about a very volumous request that he had made where Plaintiff Brewer had requested "so much material that Sgt. Porter determined to speak with you personally." According to Defendant Burton's letter, Defendant Porter had been ordered to speak to the plaintiff in regards to said request and it had nothing to do with what materials the plaintiff had requested but the letter the plaintiff had written to Defendant Thompson. Defendant Thompson stated that since the staff had worked with the plaintiff to provide the materials he had requested then the plaintiff was being provided adequate assistance. Defendant Thompson made no note about how the plaintiff was being forced to guess blindly for what materials to request. Defendant Thompson stated that the policy would not be changed.

202.    On or about November 2, 2012, Defendant Porter brough a § 1983 complaint form to the plaintiff and asked if the plaintiff was willing to pay the fifty cent per page charge for the copies. The plaintiff agreed under

protest and was charged $3.50 for seven pages.

203.    On or about October 13, 2012, Plaintiff Brewer submitted an inmate request to Defendant Porter asking for the Utah Code for extortion. The same day, Defendant Porter responded stating that the plaintiff had to be more specific.

204.    On or about November 14, 2012, Plaintiff Brewer submitted an inmate request to Defendant Porter asking for the Utah Code that defined what extortion was.

205.    On or about November 14, 2012, Plaintiff Brewer submitted an inmate request to Defendant Porter asking for the policies for medical, mail, and legal mail, the magazine ban, books, and the law library. The same day, Defendant Porter responded stating that the plaintiff had to make the request to his housing officer.

206.    On or about November 14, 2012, Plaintiff Brewer submitted an inmate request to Defendant Miller asking for access to the WCSO policy, specifically the policies for medical, mail, law library, magazines, and books. On the same day, Defendant Miller responded stating that the plaintiff had to request them one at a time.

207.    On or about November 15, 2012, Defendant Porter responded to the plaintiff's inmate request for the Utah Code that defined extortion and brought a copy of the Utah State Code Annotated, published in 2005, to the plaintiff.

208.    On or about November 15, 2012, Plaintiff Brewer submitted an inmate request to Defendant Miller asking for the WCSO policy on medical. Defendant Miller brought the plaintiff the policy on medical. However, after this Defendant Miller refused to provide any further copies of policy for the plaintiff.

209.    On or about November 21, 2012, Plaintiff Brewer wrote a letter

to Defendant Thompson. The plaintiff stated his intent on bringing action against the WCSO for violating his rights and complained of the failure to provide him with physical access to the WCSO's law library.

210.   On or about November 23, 2012, Plaintiff Brewer submitted an inmate request to Defendant Porter asking for the United States Code.

211.   On or about November 25, 2012, Defendant Porter responded to the plaintiff's inmate request for the United States Code, stating that he did not have a book with that title.

212.   On or about November 26, 2012, Plaintiff Brewer submitted an inmate request to Defendant Porter asking if the WCCF had a copy of the United States Code. Defendant Porter responded the same day, stating that they did not have a copy of the United States Code. Plaintiff Brewer submitted an inmate request asking for a book on Utah Torts. Defendant Porter responded that day stating that the WCCF did not have a book on Utah Torts. Plaintiff Brewer submitted an inmate request asking for a book on constitutional law. Defendant Porter responded the same day, stating that the WCCF had a book entitled, "The Heritage Guide to the Constitution." Defendant Porter asked if the plaintiff wanted to request it.

213.   On or about November 27, 2012, Plaintiff Brewer submitted an inmate request to Defendant Porter stating that he was interested in the book. Defendant Porter brought The Heritage Guide to the Constitution to the plaintiff later that day. As it turned out, The Heritage Guide to the Constitution only covered the history of the constitution and not any substantive law.

214.   On or about November 28, 2012, Plaintiff Brewer submitted an inmate request asking for the Westlaw Digest volume for Torts.

215.   On or about November 28, 2012, Defendant Burton sent Plaintiff Brewer a letter in the form of a memorandum stating that Defendant Thompson had

received the plaintiff's letter and had directed him to respond. Defendant Burton stated that the plaintiff was a prisoner of the USMS. Defendant Burton stated that they would be contacting the USMS and requesting that the plaintiff be moved to a different jail. Defendant Burton stated that the WCCF did not have a physical law library. Defendant Burton stated that it was pointless to continue to debate the issue.

216. On or about November 28, 2012, Plaintiff Brewer submitted an inmate request to Corporal Rizzi asking for an audience with Defendant Burton.

217. On or about November 29, 2012, Corporal Rizzi responded to Plaintiff Brewer's inmate request stating that she'd pass on the message to Defendant Burton. Defendant Burton never agreed to meet with the plaintiff.

218. On or about December 6, 2012, Plaintiff Brewer was transferred from the WCCF and booked into the SLCMJ, where the plaintiff was afforded less privileges and was significantly further away from his friends and family.

219. On or about December 6, 2012, Defendant Porter responded to Plaintiff Brewer's inmate request from November 8, 2012, where the plaintiff had asked for the Westlaw Digest for Torts. Defendant Porter responded, "No."

220. This suit now follows.


## VI. CLAIMS FOR RELIEF


### Count One
(§ 1983; 14th Amend. to U.S. Const.)
(Brewer v. Thompson, Burton, Wood, Russel, Perry, Richardson)

221. Defendants Wood, Russel, and Perry exercised deliberate indifference to Plaintiff Brewer's mental and physical health and well-being by willfully failing to provide adequate medical and mental health care to the plaintiff for his diagnosed mental health disorders and for Brewer's herniated discs in his cervical spine, for willfully denying Plaintiff Brewer adequate

tests needed to diagnose the plaintiff's herniated discs, for willfully practicing medicine upon the plaintiff without obtaining the plaintiff's prior medical records or conducting the necessary examinations and tests necessary to formulate a medical conclusion based upon accepted, medical scientific facts required to determine the needs of the plaintiff's medical and mental health, and for exercising perfunctory medical practices and treatments that amounted to no treatment at all, which constitutes punishment and cruel and unusual punishment in violation of the Fourteenth Amendment to the United States Constitution.

222.   Defendants Thompson, Burton, and Richardson exercised deliberate indifference to Plantiff Brewer's mental and physical health and well-being by willfully failing to intervene when the plaintiff and his family alerted them to the misconduct exercised by Defendants Wood, Russel, and Perry via letters written by the plaintiff and phone calls initiated by the plaintiff's family, especially since Defendants Wood and Russel had repeated the same conduct that had caused an inmate to die just the following year, which constitutes punishment and cruel and unusual punishment in violation of the Fourteenth Amendment to the United States Constitution.

### Count Two
(§ 1983; 1st and 14th Amends. to U.S. Constitution)
(Brewer v. Richardson, Manfull)

223.   Defendant Manfull acted with reckless indifference to Plaintiff Brewer's right to adequate assistance in preparing his legal documents in regards to his allegations concerning the conditions of his confinements by his willfully denying and delaying the plaintiff's efforts to obtain access to the DCCF's law library, by his chilling actions of requiring the plaintiff to allow Defendant Manfull to read his legal documents in order to have them be printed, and by failing to provide the plaintiff with adequate materials to perform

legal research in preparation for his legal battles, constituting a denial of access to the courts in violation of the First and Fourteenth Amendments to the United States Constitution.

224.   Defendant Richardson acted with reckless indifference to Plaintiff Brewer's right to adequate assistance in preparing his legal documents in regards to his allegations concerning the conditions of his confinement by his creating the policy or custom of denying inmates held at the DCCF the right to use the law library unless they had an open, pending, action in court, by his willful failure to provide adequate materials in the law library for inmates contesting the nature of their conviction and the conditions of their confinement, and by his willful failure to train Defendant Manfull in how to perform these duties, constituting a denial of access to the courts in violation of the First and Fourteenth Amendments to the United States Constitution.

### Count Three
(§ 1983; 1st and 14th Amends. to U.S. Constitution)
(Brewer v. Richardson, Jensen, Manfull)

225.   Defendants Richardson, Jensen, and Manfull acted with reckless and malicious indifference to Plaintiff Brewer's constitutional rights by initiating a retaliatory transfer against the plaintiff for the plaintiff exercising his constitutional rights to access of the courts by his filing suit, constituting retaliation, and punishment in violation of the First and Fourteenth Amendments to the United States Constitution.

### Count Four
(§ 1983; 1st and 14th Amends. to U.S. Constitution)
(Brewer v. Manfull)

226.   Defendant Manfull acted with reckless and malicious indifference to Plaintiff Brewer's constitutional rights by his intercepting the plaintiff's grievance and for harassing the plaintiff for filing a grievance on him,

constituting retaliation in violation of the First and Fourteenth Amendments to the United States Constitution.

### Count Five
(§ 1983; 1st and 14th Amends. to U.S. Constitution)
(Brewer v. Thompson)

227. Defendant Thompson acted with reckless indifference toward Plaintiff Brewer's right to uncensored correspondence and privacy in those correspondence by enacting, promulgating, and enforcing a policy or custom that chilled the expression of communication through correspondence by inmates held at the WCCF by censoring all outgoing correspondence sent by prisoners to people outside of the WCCF unless it was legal-privileged or on a generic, plain postcard only available to inmates from the WCCF's commissary in an effort to make people held at the WCCF want to return to the WCCF less, constituting an abridgment of free speech and punishment in violation of the First and Fourteenth Amendments to the United States Constitution.

### Count Six
(§ 1983; 1st and 14th Amends. to U.S. Constitution)
(Brewer v. Thompson)

228. Defendant Thompson acted with reckless indifference toward Plaintiff Brewer's right to receive uncensored correspondence and privacy in those correspondence by enacting, promulgating, and enforcing a policy or custom that chilled the expression of communication through correspondence by inmates held at the WCCF by censoring all incoming correspondence sent by people in the free world to inmates held at the WCCF unless it was legal-privileged or on a generic, plain postcard available to the public from the U.S. Post Office or from the WCSO in an effort to make people held at the WCCF want to return to the WCCF less, constituting an abridgment of free speech and punishment in violation of the First and Fourteenth Amendments to the United States

constitution.

## Count Seven
(§ 1983; 1st and 14th Amends. to U.S. Constitution)
(Brewer v. Thompson)

229.   Defendant Thompson acted with reckless indifference toward
Plaintiff Brewer's right to receive publications in the mail by enacting,
promulgating, and enforcing a policy and custom that censored all magazine
publications sent to inmates held at the WCCF in an effort to make people held
at the WCCF to not want to return to the WCCF, constituting an abridgment of
free speech, interference with the free exercise of religion, and punishment
in violation of the First and Fourteenth Amendments to the United States
Constitution.

## Count Eight
(§ 1983; 1st and 14th Amends. to U.S. Constitution)
(Brewer v. Thompson, Porter, Sekulich, Miller, Bonyai, Collingsworth)

230.   Defendant Thompson acted with reckless indifference toward
Plaintiff Brewer's right to receive books in the mail by enacting, promulgating,
and enforcing a policy and custom that censored all books sent to inmates held
at the WCCF unless they agreed to donate the book to Weber County or have the
staff withhold the book from the inmate unless the inmate agreed to donate the
book sent to the inmate to Weber County or else the staff member would place
the book in the inmate's property locker until the inmate left the WCCF, with
the intent to cause people held at the WCCF to not want to return to the WCCF,
constituting an abridgment of free speech, interference with the free exercise
of religion, and punishment in violation of the First and Fourteenth Amendments
to the United States Constitution.

231   Defendants Porter, Sekulich, Miller, Bonyai, and Collingsworth
acted with reckless indifference to Plaintiff Brewer's right to receive books

in the mail by enforcing a policy and custom that censored all books sent to the plaintiff while he was held at the WCCF unless he agreed to donate the book to Weber County or else they would withhold the book and place it in his property locker until he left the WCCF, in an effort to cause the plaintiff to not want to return to the WCCF, constituting an abridgment of free speech, interference with the free exercise of religion, and punishment in violation of the First and Fourteenth Amendments to the United States Constitution.

232.    Defendant Thompson acted with reckless indifference to Plaintiff Brewer's right to written notice and a chance to be heard regarding the censorship of his books sent to him in the mail by his willful failure to institute a policy, custom or system of providing written notice to both the inmate and the sender of the book that the book was being withheld from the inmate and providing both parties an opportunity to be heard regarding the censorship, constituting the failure to provide procedural due process protections in violation of the Fourteenth Amendment to the United States Constitution.

## Count Nine
(§§ 1951, 1962; (RICO) Pattern of Extortion)
(Brewer v. Thompson, Burton, Porter, Sekulich, Miller, Bonyai, Collingsworth)

233.    Plaintiff Brewer was extorted by Defendants Porter, Sekulich, Miller, Bonyai, and Collingsworth pursuant to an official policy and custom enacted and enforced by Defendants Thompson and Burton. Furthermore, Defendant Sekulich attempted to extort the plaintiff on at one other occasion but failed.

234.    All of the personal property extorted or attempted to be extorted from Plaintiff Brewer was purchased from companies inside and outside of the State of Utah and whom engaged in interestate commerce.

235.    Each instance of these offenses demonstrates a violation of 18 U.S.C. § 1951's prohibition of extortion in interference with interstate

commerce, and is marked as a prohibited act pursuant to 18 U.S.C. § 1961(1)(B).

236.    The series of violations of § 1961(1)(B) qualifies as a pattern of racketeering activity as defined under § 1961(5).

237.    Defendant Thompson is in violation of 18 U.S.C. § 1962(B) and (C) because he is a principal in the WCSO and because he is employed by Weber County, who is the body organization that is engaged in the alleged racketeering activities.

238.    Defendant Burton is in violation of 18 U.S.C. § 1962(B) and (C) because he is a principal in the WCSO and because he is employed by Weber County, who is the body organization that is engaged in the alleged racketeering activities.

239.    Defendants Porter, Sekulich, Miller, Bonyai, and Collingsworth are each in violation of 18 U.S.C. § 1962(C) because they played a key role in the pattern of racketeering activity and because they are employed by Weber County, who is the body organization that is engaged in the alleged racketeering activities.

240.    The defendants knew, or reasonably should have known, that their conduct, attitudes, and actions would amount to extortion, as defined under 18 U.S.C. § 1951, and to the unlawful taking of personal property, and that in so doing it would injure Plaintiff Brewer's interests in that property.

241.    Title 18 U.S.C. § 1964(c) gives civil litigants the power to contest violations of 18 U.S.C. § 1962 in federal district courts.

### Count Ten
(§ 1983; 1st and 14th Amends. to U.S. Constitution)
(Brewer v. Thompson, Burton, Porter)

242.    Thompson, Burton, and Porter acted with reckless indifference to Plaintiff Brewer's right to adequate assistance in preparing his legal documents in regards to his conditions of confinement by willfully denying

Plaintiff Brewer physical access to the law library and other legal materials in order for the plaintiff to research the nature of his claims and ultimately preventing him from filing his claims with the courts until after he left the WCCF, constituting a denial of access to the courts in violation of the First and Fourteenth Amendments to the United States Constitution.

## Count Eleven
### (§ 1983; 1st and 14th Amends. to U.S. Constitution)
### (Brewer v. Thompson, Burton)

243.   Defendants Thompson and Burton acted with reckless and malicious disregard for Plaintiff Brewer's constitutional rights by having Plaintiff Brewer transferred from the WCCF in retaliation for his attempts to access the courts and writing his elected officials, constituting a denial of access to the courts, retaliation, and punishment in violation of the First and Fourteenth Amendments to the United States Constitution.

## VII. EXHAUSTION OF ADMINISTRATIVE REMEDIES

244.   The plaintiff has exhausted all available administrative remedies as pertain to Counts One and Two, and Four through Ten.

245.   The plaintiff could not exhaust the administrative remedies at the DCCF in regards to Count Three because the plaintiff was no longer at the DCCF and therefore the plaintiff should be excused for not exhausting the administrative remedies as they were not available.

246.   The plaintiff could not exhaust the administrative remedies at the WCCF in regards to Count Eleven because the plaintiff was no long at the WCCF and therefore the plaintiff should be excused for not exhausting the administrative remedies as they were not available.

//

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brewer prays that this Honorable Court enters an order:

247.    Issuing a declaratory statement declaring the acts and omissions of the defendants have violated Plaintiff Brewer's rights, have violated federal law, and stating the defendants' duties with respect to those rights and to those laws;

248.    Award Plaintiff Brewer compensatory and presumed damages in an amount to be determined at trial in excess of $100,000.00 against the defendants jointly and severelly;

249.    Award Plaintiff Brewer nominal damages against the defendants jointly and severally;

150.    Award Plaintiff Brewer punitive damages in an amount to be determined at trial in excess of $25,000.00 against each defendant;

250.    Award Plaintiff Brewer his costs and any applicable attorney's fees; and,

251.    Award Plaintiff Brewer any other and further relief as the Court may deem just and proper.

## X. TRIAL BY JURY DEMANDED

252.    Trial by jury is hereby demanded on all claims alleged herein, and the parties are hereby given notice pursuant to Fed.R.Civ.P. 33(a)-(c).

## XI. VERIFICATION

253.    I, Jordan Alan Never Brewer, declare and verify under penalty

67

under the laws of the United States of America, pursuant to 28 U.S.C. § 1946, that I have read the foregoing and that I know it to be true and correct to the best of my knowledge and belief.

Executed on this ___ day of June, 2015.

Respectfully submitted,


Jordan A. Brewer
Plaintiff, pro se